744 P.2d 181
## IN the Matter of JASON Y., a Child.

## STATE of New Mexico, ex rel. HUMAN SERVICES DEPARTMENT, Petitioner-Appellee,

v.

## CYNTHIA Y., Respondent-Appellant.

### No. 9993.

Court of Appeals of New Mexico.

Sept. 15, 1987.

Angela L. Adams, Acting Gen. Counsel, John Petoskey, Asst. Gen. Counsel, Santa Fe, Hal Stratton, Atty. Gen., Peter Klages, Sp. Asst. Atty. Gen., Albuquerque, for petitioner-appellee.

Albert B. Lassen, Lassen, Combs & Kelly, Thomas J. Horne, Thomas J. Horne, P.C., Albuquerque, for respondent-appellant.

Daniel E. Pedrick, Albuquerque, guardian ad litem.

## OPINION

GARCIA, Judge.

Respondent, the natural mother of Jason Y., appeals from the order of the children's court terminating her parental rights to her minor child. We proposed summary affirmance, and mother filed a timely memorandum in opposition. Not persuaded by mother's memorandum, we now affirm the trial court.

### ISSUE

Mother contends that New Mexico's termination of parental rights statute, NMSA 1978, Section 32-1-54 (Repl.Pamp.1986), is constitutionally defective in that it fails to provide for a defense of mental illness.

### FACTS

The facts on appeal are not in dispute. Mother suffers from a chronic mental illness or disorder which has rendered her incapable of being a custodial parent. Her minor child, Jason, was placed in foster care at an early age, and the state initiated a treatment and rehabilitation program for the family. The child was subsequently returned to mother's physical custody, but despite reasonable efforts by the state to assist mother in adjusting the conditions which made her incapable of caring for her child, the rehabilitation and treatment failed. Mother refused to seek or accept necessary treatment for her condition. The child was again removed from mother's custody and was ultimately adjudicated an abused or neglected child.

Ultimately, the state petitioned the children's court to terminate mother's parental rights, alleging the child had been neglected or abused and that the conditions and causes of neglect were unlikely to change in the foreseeable future despite the state's efforts to assist respondent in adjusting these conditions. In its petition, the state contended that the child had lived in the home of others for extended periods of time; that the parent-child relationship had disintegrated; and a psychological parent-

child relationship had developed between a substitute parent and the child. Finally, the state asserted that the child who was able to express a preference indicated he no longer wished to live with his natural mother.

During the course of proceedings concerning the welfare of the minor child, mother had been involuntarily committed and hospitalized for treatment on at least five occasions. Mother, through counsel, objected to proceeding on the state's petition for termination of parental rights because she was subject to an involuntary commitment order at the time of the scheduled hearing. Nevertheless, mother, together with counsel, appeared at the hearing, participated in, and presented witnesses and testimony on her own behalf.

Dr. Thomas White, a clinical psychologist, presented evidence that mother is psychotic, she demonstrates paranoid thinking, and thus, is unable to care for her child. He testified that she suffers from a long-term disorder requiring intensive therapy and has little possibility for change in the future. A second psychologist, Dr. Michael Rodriguez, testified that mother was suffering from schizophrenia, that she required medication but refused to take it, and that she was unable to serve as an appropriate parent. He characterized mother as uncooperative. He testified that mother viewed the doctors as part of a plot against her.

A counselor, Joy Flavel, who had worked with the minor child for many months, provided testimony which served as the basis of court findings that the child suffered "night terror" and "day fear." Ms. Flavel testified that Jason was having bad dreams about his mother kidnapping and hurting him; during the child's waking hours, he feared that his mother was around. The child was afraid, confused and angry, and felt that he was somehow responsible for his mother's illness. Ms. Flavel stated that the child had become very anxious and was involved in constant episodes of aggression, including fighting in school and in his foster home. Ms. Flavel related an incident which occurred in the child's presence, wherein mother physically attacked a Department of Human Services worker. The counselor recommended that Jason have no contact with his mother because he lacked the requisite skills to resolve the feelings and conflicts which resulted from home visits. Other state's witnesses also provided evidence of mother's repeated inappropriate, unusual and, at times, violent behavior related to her son.

The mother's own testimony, as characterized in the docketing statement, was bizarre. She contended that her real child had been abducted by the state. She testified that Jason was not her real child, but only a child who looked like her real son. She testified that since her own mother's death, she had been unable to face reality. She described the affects of psychotropic medication and why she refused such treatment. The only other witness presented by mother was that of her uncle who testified that mother did a good job of taking care of her children until 1982 or 1983, but since then had been ill.

Based on the testimony, the court concluded that the state had presented clear and convincing evidence that the minor child was abused and neglected and the cause of the child's status was the behavior of his mother. It also concluded, pertinent to the issue before us, that Section 32–1–54 was not constitutionally defective in failing to provide a defense based on the findings of mental illness. The court determined that the Department of Human Services and other agencies had made reasonable efforts to assist mother but such efforts had failed. Finally, the court determined that mother had been unable to change or adjust the conditions which rendered her unable to properly care for her child and that it was unlikely that those conditions would change in the future. Based on the court's findings and conclusions, it entered an order terminating mother's parental rights.

### DISCUSSION

Mother's constitutional attack on the statute is founded upon claims of deprivation of due process and equal protection guarantees under state and federal consti-

tutions. Mother contends that mental incapacity should be recognized as a defense in termination of parental rights proceedings. She also inferentially argues that proceedings should have been stayed because of her mental incapacity. Mother's equal protection attack on the statute, while not clearly stated, appears two-pronged: first, defendants in criminal proceedings may assert insanity or mental illness as an affirmative defense. *See* SCRA 1986, 14–5102 and 14–5103. Because the legislature did not specifically provide for a mental illness defense in the statute, mother claims equal protection violations. Second, New Mexico law grants defendants in criminal cases protections which should be extended to respondents in termination proceedings. We discuss each prong of mother's argument separately.

In considering constitutional challenges, we first presume the validity of legislative enactments. *Espanola Housing Authority v. Atencio*, 90 N.M. 787, 568 P.2d 1233 (1977). A court will uphold the efficacy of a statute, unless satisfied beyond all reasonable doubt that the legislature went outside the constitution in enacting the statute. *Id.* The burden, then, is on the party asserting the unconstitutionality of the enactment to demonstrate to the court that the legislation was clearly arbitrary and unreasonable, not just potentially arbitrary and unreasonable. *See Livingston v. Loffland Bros. Co.*, 86 N.M. 375, 524 P.2d 991 (Ct.App.1974). The court must then review the classification fixed by the legislature to determine whether it violates principles of uniformity or equal protection. *See Gallegos v. Homestake Mining Co.*, 97 N.M. 717, 643 P.2d 281 (Ct.App.1982). Legislative classifications do not violate principles of uniformity or equal protection when they are founded on a reasonable basis or when there is rational justification. *Id.* "If the objective is legitimate and the classification is rationally related to that objective, it is not unconstitutionally arbitrary." *Id.* at 722, 643 P.2d at 286. With these concepts in mind, we turn to mother's arguments.

## EQUAL PROTECTION

Different interests are involved in parental rights termination cases than in criminal cases. Respondent concedes that in proceedings to terminate parental rights, the court is to give primary consideration to the physical, mental and emotional welfare and needs of the child. *See In re Adoption of Doe*, 99 N.M. 278, 657 P.2d 134 (Ct.App.1982); *see also* NMSA 1978, Section 32–1–54(A) (Repl.1986). A natural parent's desire for and a right to the companionship, care, custody and management of his or her child is an important interest that warrants deference and, absent a powerful countervailing interest, protection. *Lassiter v. Department of Social Serv. of Durham County, North Carolina*, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981).

While noting that the parental interests involved are constitutionally protected, *Quilloin v. Walcott*, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978), we must also note that these rights are not absolute. They must be balanced together with the rights of children and with the state's legitimate interest. *Parham v. J.R.*, 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979). The appropriate balance was discussed by the court in *Hernandez v. State ex rel. Arizona Dep't of Economic Sec.*, 23 Ariz. App. 32, 35, 530 P.2d 389, 392 (1975), where the court said:

As usual, we are faced with the judicial task of balancing competing interests. We are not only concerned with the rights of the natural parents but also the rights of the minor child, which include the right to good physical care, adequate food, shelter and clothing, the right to emotional security, the right to be free from injury and neglect and the right to be with his natural parents and siblings.

\* \* \* [F]or some parents the loss of a child through this legal process can be as serious as imprisonment in a criminal case. However, we are not dealing solely with the rights of the parents, and the problem must be analyzed with all interests in mind.

There are substantial policy reasons for disallowing a defense of mental incapacity in termination proceedings. To allow such a defense could result in situations where children would be left in the custody of parents who are unable, due to mental illness, to adequately care and provide for their children. In some cases, the child would be left in dangerous situations where, as here, the mentally ill parent exhibited bizarre and violent behavior. Contrary to the rule that the best interest of the child is of paramount importance in a termination proceeding, allowing mental illness as a defense would result in leaving the child in a hostile environment which is detrimental to his physical, mental, and emotional needs.

In the second prong of mother's equal protection argument, mother argues that NMSA 1978, Section 31–9–1 (Repl.Pamp. 1984) grants other protections to criminal defendants that should be allowed for respondents in termination proceedings. Specifically, Section 31–9–1 provides that if there is a question as to a criminal defendant's competency to stand trial, the cause is to be suspended pending a determination of the issue. If a defendant does not have the capacity to stand trial, the court may not proceed to trial, but rather, must determine whether the defendant should be committed in accordance with provisions of the law governing involuntary hospitalization for the mentally ill. The proceedings are stayed because one accused of criminal activity cannot be validly tried while mentally incompetent to stand trial. *State v. Tartaglia,* 80 N.M. 788, 461 P.2d 921 (Ct.App. 1969). In contending the difference in treatment constitutes a denial of equal protection of the laws, mother argues "[a]n incompetent defendant does not hold a superior position to an incompetent Respondent from the standpoint of his or her right to constitutional protections under our New Mexico and United States Constitution."

At first glance, mother's argument is appealing, but it does not withstand close scrutiny. While criminal proceedings may be suspended where a defendant is not competent, different rules apply in civil cases. An infant or an incompetent person may sue or be sued. SCRA 1986, 1–017(C) provides in part: "[t]he court shall appoint a guardian ad litem for an infant or incompetent person not otherwise represented in an action or shall make such other order as it deems proper for the protection of the infant or incompetent person." Mother was at all times material to the proceeding represented by counsel. No claim is advanced that the court erred either by failing to enter an order for the protection of respondent or by failing to appoint a separate guardian ad litem. *See Roybal v. Morris,* 100 N.M. 305, 669 P.2d 1100 (Ct. App.1983).

**DUE PROCESS**

Mother's last challenge to the statute is based on her claim that Section 32–1–54 denies her due process of law. We do not agree. The termination procedures specifically provide for notice and an opportunity to be heard. The statute provides for appointment of counsel for any parent who is financially unable to obtain counsel, or if in the court's discretion, counsel is needed. Finally, the statute provides that the state prove its case by clear and convincing evidence, and a higher standard of proof beyond a reasonable doubt is further provided for children subject to the requirements of 25 U.S.C. Section 1912 (f) (1982) in proceedings under the Indian Child Welfare Act of 1978, 25 U.S.C. Sections 1901 et seq. (1982 ed.). We believe that the termination statute grants parents adequate procedural due process protections and we find no constitutional infirmity on the grounds raised by mother.

**SUMMARY**

We cannot say that the legislature went outside of the constitution when it enacted Section 32–1–54. Moreover, when giving primary consideration to the welfare of the child, as we are so required under state law, it is apparent that there is a reasonable basis and rational justification for the legislature's omission of mental illness as a

defense to a termination of parental rights proceeding. Mother urges this court to adopt a construction of Section 32–1–54 which would provide additional protections for parents who are mentally ill. This is a public policy issue for the legislature to decide. We need not inquire into the wisdom, the policy or the justness of legislative acts. *Gruschus v. Bureau of Revenue,* 74 N.M. 775, 399 P.2d 105 (1965). For the reasons stated above and in our calendaring notice, we determine that mother's equal protection and due process arguments necessarily fail.

Affirmed.

IT IS SO ORDERED.

BIVINS and FRUMAN, JJ., concur.