751 P.2d 715

**Simran Kaur KHALSA, a/k/a Elena E. Lancaster, Petitioner–Appellee,**

v.

**Simran Singh KHALSA, a/k/a David E. Lancaster, Respondent–Appellant.**

No. 9784.

Court of Appeals of New Mexico.

Feb. 2, 1988.

Certiorari Denied March 2, 1988.

Ana Marie Ortiz, Northern N.M. Legal Services, Inc., Santa Fe, Maritza Gonzalez Ortiz, Hato Rey, P.R., for petitioner-appellee.

Richard S. Lees, Scheuer & Engel, P.C., Santa Fe, for respondent-appellant.

## OPINION

GARCIA, Judge.

### FACTS

The parties were married in 1973. At the time, they were Sikhs and believed in and practiced the Sikh religion. In June 1976, the parties' oldest child, Hari Jap Singh Khalsa, was born, and in January 1981, the parties had a second child, Kartar Singh Khalsa. Both children's Sikh names appear on their birth certificates and, while the parties were married, both children were raised as Sikhs. The family observed the requirements of their religion, including the wearing of distinct apparel and turbans, reading from the Guru Granath, the Sikh scriptures, and the assumption of Sikh names. Their adherence to principles and tenets of their faith continued throughout their marriage.

Marital discord ultimately lead to the breakdown of their marriage and in December 1982, mother filed an uncontested petition for divorce. Mother was granted the divorce and awarded sole custody of the two children.

In December 1983, mother remarried. Shortly thereafter, mother abandoned the Sikh religion and began discouraging the children from practicing Sikhism. Mother also began calling the children by other than their Sikh names. Father objected to the children not being raised as Sikhs, and

the parties' disagreements over religious differences escalated. In May 1984, father filed a motion requesting sole custody of the children or, in the alternative, joint custody.

In violation of father's discovery request, mother failed to timely disclose the names of any expert witnesses whom she planned to call at trial on her behalf. The day prior to trial, however, mother submitted a witness list naming two proposed, but previously undisclosed, experts: Dr. Lillian Gonzales–Ortiz, a psychologist, and Father William Kent Burtner, a Catholic priest. Over father's objections, both witnesses testified.

In December 1986, following a hearing on the merits, the trial court entered its order regarding custody, visitation and child support. The court found that a material change in circumstances had occurred since the court's last permanent order on custody, but concluded that joint custody was not in the children's best interest. Accordingly, the court ordered that sole custody of the children remain with mother; that father have visitation with the children at his residence for one month each summer; and that the children not participate voluntarily or involuntarily in any Sikh religious activities with father. Father appeals.

**ISSUES**

Father raises the following five issues on appeal: (1) whether the trial court erred in denying father's motion for joint custody; (2) whether the trial court erred in enjoining father from encouraging his children to practice and participate in the Sikh religion during their visits with father; (3) whether the trial court's decision maintaining sole custody of the children with mother was based on an unconstitutional religious preference; (4) whether the trial court erred in admitting certain witness testimony; and (5) whether father was denied a fair trial due to the trial court's cumulative errors. Under the specific facts of the present case, the trial court erred in allowing the surprise witnesses to testify and, thus, we reverse.

Although the first issue is dispositive of this case, we will nonetheless additionally address both the second and fourth.

**ISSUE I & IV** (Whether the trial court erred in denying father's motion for joint custody based on the testimony of surprise witnesses.)

The trial court's denial of father's joint custody motion in the present case rests solely on the testimony of mother's expert witness, Dr. Gonzales. All other experts indicated that both father and mother were good, loving parents, capable of serving as joint custodians. Dr. Gonzales, however, presented testimony to the effect that joint custody was not in the children's best interest. This evidence, alone, would support the trial court's finding that joint custody was not in the children's best interest. Thus, if Dr. Gonzales' testimony had been properly before the trial court, the trial court would be affirmed under our substantial evidence rule. *See Sandoval v. Department of Employment Sec.*, 96 N.M. 717, 634 P.2d 1269 (1981).

A reviewing court may, however, reverse the trial court upon a finding of abuse of discretion. In *State v. Hargrove*, 81 N.M. 145, 464 P.2d 564 (Ct.App.1970), this court defined abuse of discretion as:

"[a]n erroneous conclusion and judgment, one that is clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn from such facts and circumstances. * * * It is really a discretion exercised to an end or purpose not justified by, and clearly against, reason and evidence."

*Id.* at 147, 464 P.2d at 566 (quoting Bowers, *Judicial Discretion of Trial Courts* § 12 (1931)). Here, the trial court abused its discretion in allowing both surprise witnesses to testify over father's objections.

In preparing for litigation on custody, father served mother with interrogatories and requests for production. The interrogatories specifically asked mother for a list of witnesses and a summary of the witnesses' testimony. Mother did not comply with her disclosure obligations. Father's request for production sought all doc-

uments to be used at trial, information concerning the certificates of training or qualification of proposed experts, and any psychological evaluations of mother and children. Mother did not produce any of these documents or information.

In May 1985, father filed a motion to compel discovery; the motion was not heard by the court. Fifteen months later, on the afternoon before trial, father received a list of witnesses including the names of both Dr. Gonzales and Father Burtner. Attached to the list were psychological evaluation reports on mother and both children prepared by Dr. Gonzales.

Father immediately filed a written objection and moved to strike the proposed testimony of Dr. Gonzales and any exhibits. The following day, before trial, father again objected to the testimony of both experts based on surprise and prejudice. Father informed the trial court that: (1) he had no prior knowledge of the witnesses' testimony; (2) he had been given no opportunity to study the basis of the psychological evaluations; and (3) he had been provided no opportunity to obtain an independent review of the evaluations. Accordingly, father asked that the witnesses be prohibited from testifying and that the evaluations not be allowed into evidence.

Father's objection was overruled. The judge noted, however, that mother's concealment of the identities of expert witnesses was equal to "trying to have a smoking gun secreted," and that mother's counsel had frustrated the legal process. The trial court nonetheless concluded that counsel's behavior should not jeopardize the rights of the parties and, thus, the parties would proceed to trial as scheduled. The court advised father to meet with both experts during the lunch hour and if the hour proved inadequate, father could renew his objection thereafter.

After lunch, before either expert took the stand, father renewed his objection to the experts' testimony. The objection was again denied and both Dr. Gonzales and Father Burtner were allowed to testify. In the midst of Dr. Gonzales' testimony, father again objected, informing the court that Dr. Gonzales' testimony conflicted with the information she had given counsel during the lunch hour. Father moved to strike her testimony and continued to renew his objection based on surprise. His motion and objection were overruled.

In *State v. Manus*, 93 N.M. 95, 597 P.2d 280 (1979), *overruled on other grounds*, 98 N.M. 786, 653 P.2d 162 (1982), the supreme court addressed the issue of surprise witnesses. In *Manus*, defendant was on trial for murder. During discovery, the state submitted a list of witnesses it planned to call. At trial, however, the state called a non-disclosed witness, Seig, as a rebuttal witness. Defendant objected to Seig's testimony on the basis of surprise. Based on that objection, the trial court postponed Seig's testimony until the following day in order to allow defendant an opportunity to depose him. Subsequently, Seig was adequately cross-examined. Ultimately, defendant was found guilty of murder. Defendant appealed his conviction arguing, inter alia, that allowing Seig to testify was error.

Although the supreme court was critical of the state's failure to disclose the witness' identity prior to trial, the *Manus* court noted that mere failure to disclose, alone, was not grounds for reversal. The court stated that the party must show that he was prejudiced by such non-disclosure. In *Manus*, the court held that defendant was not prejudiced because defendant was given an opportunity to depose the witness before the witness took the stand and, as a result of such deposition, the witness was "vigorously and competently" cross-examined at trial. The court concluded that allowing the defendant an opportunity to depose removed the prejudice caused by the initial surprise. Such is not the case here.

The pertinent facts here are similar, at least initially, to those in *Manus*. As in *Manus*, the stakes here were high. "[T]he loss of a child through [the] legal process can be as serious as imprisonment in a criminal case." *In re Jason Y.*, 106 N.M. 406, 408, 744 P.2d 181, 183 (Ct.App.1987) (quoting *Hernandez v. State ex rel. Arizo-*

na Dep't of Economic Sec., 23 Ariz.App. 32, 35, 530 P.2d 389, 392 (1975)). Here, as in *Manus*, mother had an obligation to comply with discovery, specifically good faith answers to interrogatories. SCRA 1986, 1–033(A). Father was not informed of the experts' identities until shortly before trial. Moreover, father objected to the testimony of both experts. The similarities, however, end here.

While the trial court in *Manus* allowed the defense ample opportunity to depose the surprise witness, father, here, was given only one hour in which to question both expert witnesses and prepare for cross-examination. The interview was to take place over a break during the course of the proceedings. Upon returning from the lunch break, father specifically asked the trial court for an opportunity to depose Dr. Gonzales and informed the trial court that Dr. Gonzales' testimony at trial conflicted with her statements given during the lunch hour. Without a deposition to impeach Dr. Gonzales, counsel operated at a significant disadvantage.

The court in *Manus* refused to reverse defendant's conviction because the defense was given an adequate opportunity to depose the witness and defendant's lack of prejudice was evidenced by counsel's vigorous and competent crossexamination. In the present case, father was given an inadequate opportunity to interview both witnesses, was denied an opportunity to depose them, and was unable to vigorously or effectively cross-examine. The court's offer to allow counsel one hour to meet with, interview and prepare for the cross-examination of two experts presented a true Hobson's choice. Had father declined the offer, *Manus* may well have precluded a subsequent complaint.

In allowing both expert witnesses to testify, the trial court noted that mother had frustrated the legal process. The court stated that mother's counsel's behavior should not jeopardize the rights of the parties, and allowed both experts to testify. The trial court's decision to allow Dr. Gonzales' and Father Burtner's testimony, however, in fact "jeopardized" the rights of

father by not allowing him an adequate opportunity to interview, depose and prepare for an adequate cross-examination of both experts. Although the trial court admonished mother for her unwillingness to cooperate, the court nonetheless denied father's objection, thus, jeopardizing his ability to adequately defend.

The surprise testimony of Dr. Gonzales is the only evidence supporting the trial court's denial of joint custody. The balance of all other evidence indicated that both parents were capable of serving as joint custodians. The trial court's decision to allow both Dr. Gonzales and Father Burtner to testify, however, was not justified by, and was clearly against "the logic and effect of the facts and circumstances before the court." *See State v. Hargrove*, 81 N.M. at 147, 464 P.2d 566. Dr. Gonzales' testimony is the only evidence supporting the court's denial of joint custody. The balance of the evidence indicated that both parents were capable of serving as joint custodians. Thus, the trial court abused its discretion in allowing such testimony.

**ISSUE II** (Whether the trial court erred in enjoining father from encouraging his children from voluntarily or involuntarily participating in Sikh religious activities.)

This issue presents a matter of first impression. Although we need not address this issue because of our holding in issue 1, we deem it necessary to give guidance as to the scope of a court's intervention in religious beliefs and practices in child custody disputes.

Without any finding that participation in religious activities was harmful to the children here, the trial court enjoined the parties from freely discussing their religious beliefs with their children. Specifically, the trial court ordered that when the children were with father, they could not voluntarily or involuntarily participate in any Sikh activity, including any church activity, Sikh camp or Sikh day care center.

It is well established that in child custody matters the best interests and welfare of the children are the primary and controlling considerations. *Schuerman v.*

*Schuermann,* 94 N.M. 81, 607 P.2d 619 (1980); *In re Briggs,* 91 N.M. 84, 570 P.2d 915 (1977); *Boone v. Boone,* 90 N.M. 466, 565 P.2d 337 (1977). Similarly, where there is a conflict between the parents regarding the religious faith and training of the children, the paramount concern is the welfare of the children. *See Munoz v. Munoz,* 79 Wash.2d 810, 489 P.2d 1133 (1971) (en banc).

Courts should proceed cautiously and with circumspection when dealing with religious issues. "[I]ntervention in matters of religion is a perilous adventure upon which the judiciary should be loath to embark." *Wojnarowicz v. Wojnarowicz,* 48 N.J.Super. 349, 354, 137 A.2d 618, 621 (1958). In *Munoz v. Munoz,* the court noted:

> The courts are reluctant * * * to interfere with the religious faith and training of children where the conflicting religious preferences of the parents are in no way detrimental to the welfare of the child. The obvious reason for such a policy of impartiality regarding religious beliefs is that, constitutionally, American courts are forbidden from interfering with religious freedoms or to take steps preferring one religion over another.
>
> *        *        *        *        *        *
>
> Thus, the rule appears to be well established that the courts should maintain an attitude of strict impartiality between religions and should not disqualify any applicant for custody or restrain any person having custody or visitation rights from taking the children to a particular church, except where there is a clear and affirmative showing that the conflicting religious beliefs affect the general welfare of the child.

*Id.* 79 Wash.2d at 812–13, 489 P.2d at 1135 (citations omitted); *see, e.g., Hanson v. Hanson,* 404 N.W.2d 460 (N.D.1987); *In re Marriage of Murga,* 103 Cal.App.3d 498, 163 Cal.Rptr. 79 (1980); *Compton v. Gilmore,* 98 Idaho 190, 560 P.2d 861 (1977); *Felton v. Felton,* 383 Mass. 232, 418 N.E. 2d 606 (1981); *Robertson v. Robertson,* 19 Wash.App. 425, 575 P.2d 1092 (1978); Annotation, *Religion as Factor in Child Custody and Visitation Cases,* 22 A.L.R.4th

971 (1983); Note, *The Religious Upbringing of Children After Divorce,* 56 Notre Dame Law, 160 (1980).

■ In justifying a prohibition of religious restrictions on visitation rights, physical or emotional harm to the child cannot be assumed, but must be demonstrated in detail. *Hanson v. Hanson; Felton v. Felton.* Factual evidence of harm rather than "mere conclusions and speculation" is required. *Robertson v. Robertson.*

■ Thus, a custodial parent's general testimony that the child is upset or confused because of the non-custodial parent's religious practice is insufficient to demonstrate harm. *Felton v. Felton; Munoz v. Munoz.* Further, general testimony that the child is upset because the parents practice conflicting religious beliefs is likewise insufficient. *Hanson v. Hanson* (mother's testimony that father, a member of the Pentecostal Apostolic church, had told the children, among other things, that the Catholic church believes in cannibalism, which upset the children, was insufficient to prohibit father from taking the children to his church); *Munoz v. Munoz* (parent's speculation that six-year-old son, who attended both Mormon services with his mother and Catholic services with his father, was emotionally harmed thereby, was insufficient. The court concluded that duality of religious beliefs, do not, per se, create a conflict upon young minds.).

Although most disputes involve conflicting religious practices between the divorced parents, the same principles apply equally where one parent practices no religion. *Robert O. v. Judy E.,* 90 Misc.2d 439, 395 N.Y.S.2d 351 (Fam.Ct.1977) (mother, a nonbeliever in organized religion, sought to enjoin non-custodial father from taking child to church services. The court recognized that although the building of moral character was possible without religious beliefs or training, the child's interests were best served by allowing him to *continue* his religious training with father.).

■ A court's reluctance to interfere with the religious upbringing of children, however, is not absolute. Religious restric-

tions placed upon visitation rights have been upheld where evidence of physical or emotional harm to the child has been substantial. *See Funk v. Ossman,* 150 Ariz. 578, 724 P.2d 1247 (App.1986) (court upheld order enjoining non-custodial parent from taking his eight-year-old son to formal Jewish religious training. Evidence presented at trial included the testimony of three psychologists, one of whom testified that child had anxiety problems caused by the religious differences of his parents which manifested itself in encopresis); *Bentley v. Bentley,* 86 A.D.2d 926, 448 N.Y.S.2d 559 (1982) (court affirmed order prohibiting non-custodial father from instructing his children in the teachings of the Jehovah's Witnesses. The custodial mother was Catholic and the court found that the children were "emotionally strained and torn" as a result of the parties' conflicting religious beliefs).

Thus, although the courts are reluctant to enjoin a non-custodial parent from practicing his religion with his children, the courts can and will enjoin such practice where the testimony concerning physical or emotional harm to the child is detailed and the best interests of the child will be served through the prohibition. Here, the evidence concerning the impact on the children consisted of testimony by Father Burtner and mother's general testimony that the children appeared upset and disturbed after visitations with father. Because we have held that the trial court abused its discretion in permitting Father Burtner to testify, however, the trial court could not restrict father from practicing his religion with his children based on such testimony. Mother's general testimony alone, however, was insufficient to support the restriction.

■ In sum, we adopt the view expressed in *Munoz.* Courts should adhere to a policy of impartiality between religions, and should intervene in this sensitive and constitutionally protected area *only* where there is a clear and affirmative showing of harm to the children. Restrictions in this area present the danger that court-imposed limitations will unconstitutionally infringe upon a parent's freedom of worship or be perceived as having that effect.

■ Thus, we hold that, in determining whether a parent involved in a child custody dispute should be restricted from practicing or encouraging the child in a religious belief or practice, the trial court must consider the following:

1. Whether there exists detailed factual evidence demonstrating that the conflicting beliefs or practices of the parents pose substantial physical or emotional harm to the child;

2. Whether restricting the religious interaction between the parent and child will necessarily alleviate this harm; and

3. Whether such restrictions are narrowly tailored so as to minimize interference with the parents' religious freedom.

■ Here, there was no evidence that either child was harmed by exposure to father's religion. Accordingly, we further hold the trial court's judgment enjoining both parents from freely discussing their religious beliefs with the children, and specifically prohibiting father from encouraging his children to participate in any Sikh activity, to be error.

## CONCLUSION

The trial court erred in allowing both surprise expert witnesses to testify. Since Dr. Gonzales' testimony provided the sole basis for the trial court's denial of father's joint custody request, and Father Burtner's testimony provided the sole basis for the religious limitations, we remand to the trial court for a new trial. Father is awarded his costs on appeal.

IT IS SO ORDERED.

DONNELLY, C.J., and MINZNER, J., concur.