868 P.2d 1256 (1993)
117 N.M. 31
In the Matter of the ADOPTION OF J.J.B., a Minor,
Carla Ann ROTH and Kyle David Franz Roth, Petitioners-Appellees,
v.
Edward BOOKERT, Respondent-Appellant.
No. 14318.
Court of Appeals of New Mexico.
November 30, 1993.
Certiorari Granted February 8, 1994.
*1257 Paul Cohen, Albuquerque, for respondent-appellant.
Cynthia A. Fry, Martha J. Kaser, Albuquerque, for petitioners-appellees.
Ella Joan Fenoglio, Albuquerque, guardian ad litem for the Child.
Tom Udall, Atty. Gen., Diane Garrity, Sp. Asst., Atty. Gen., Angela Adams, Chief Children's Court Atty., Children, Youth & Families Dept., Santa Fe, amicus curiae, New Mexico Children, Youth and Families Dept.
The National Council for Adoption, Karen Vandiver-Rioux, Albuquerque, James S. Albers, Albers and Albers, Columbus, OH, amicus curiae, National Council for Adoption.
Timothy V. Flynn-O'Brien, Fred Abramowitz, Cooperating Attys., ACLU-NM, ACLU-NM, Phillip B. Davis, Reber Boult, Co-Legal Directors, Albuquerque, amicus curiae, American Civil Liberties Union.

OPINION
DONNELLY, Judge.
Appellant, Edward Bookert (Father), appeals from a judgment terminating his parental rights and granting the petition of Appellees, Carla and Kyle Roth (Petitioners), to adopt J.J.B. Although Father has raised five issues on appeal, we determine that his claim that Petitioners failed to establish by clear and convincing evidence a valid basis for the termination of his parental rights is dispositive, and reverse.

FACTS
Father and Ana Medina (Mother) began living together in 1981. Although they never married, they cohabited until November 1990. During this period, two daughters, E.B. and C.B., and a son, J.J.B, were born of their relationship. J.J.B., the subject of this appeal, was born on April 14, 1990.
During most of the period they lived together, the family resided in New Mexico. In August 1990, however, the family moved to Tucson, Arizona, where Father obtained *1258 employment. On November 14, 1990, after personal differences arose, Mother left Father and returned to Albuquerque with the three children. Father, after unsuccessfully attempting to dissuade Mother from returning to New Mexico, agreed to assist her with the move. He purchased airplane tickets for her and the children, and gave her approximately $80 cash. She also took the family's food stamps worth approximately $300.
Shortly after the separation, Father was laid off from his job as a maintenance man at a motel. On December 6, 1990, he returned to Albuquerque and visited with his family, who was living with Mother's father. During this visit, he bought presents for the children, clothes, and other personal items for the family. Additionally, he gave Mother food stamps.
Father went to Hobbs to stay with his mother. While in Hobbs, he maintained contact with Mother and the children. During December and the first week of January 1991, Father spoke with Mother or the children by telephone on twelve occasions.
On Friday, January 4, 1991, Father received a telephone call from Gerald Ortiz y Pino, a social worker with La Familia Adoption Agency, notifying him that Mother had delivered his son, J.J.B., to the agency and authorized it to place J.J.B. for adoption. Father immediately protested, and told Ortiz y Pino that he wanted his son back.
Father testified that he left Hobbs Saturday night and returned to Albuquerque Sunday morning. He attempted to see Ortiz y Pino on Monday, but was unable to schedule an appointment. When he succeeded in meeting with Ortiz y Pino on Tuesday, January 8, 1991, Father restated his objection to the adoption and requested that his son be returned. Ortiz y Pino refused to turn over the child and advised Father to consult an attorney.
On January 9, 1991, Ortiz y Pino wrote to Father in Hobbs, acknowledging that he had expressed his opposition to the adoption, stating Mother had reported that Father was currently unemployed and had not sent any financial help for the past two months. Ortiz y Pino also recommended that Father "seek legal advice through a lawyer of your own choosing, especially if you decide to contest the potential adoption of the child."
Father consulted an attorney on January 18, 1991, who advised La Familia that he was representing Father. Fifteen days later, on January 23, 1991, Petitioners filed a petition to adopt J.J.B. Although Petitioners and La Familia were aware of Father's objection to the adoption and Father's identity, he was not served with a copy of the summons or petition for adoption until March 12, 1991.
In March 1991, Mother sought to withdraw her consent that her son be relinquished for adoption. On May 15, 1991, and again on July 1, 1991, Father moved for permission to visit with J.J.B. No action was taken on his motions until November 1, 1991, when the trial court entered an order denying Father visitation.
On January 15, 1992, Father was permitted to have supervised visitation with J.J.B. During the period from November 23, 1991, through April 16, 1992, he visited with his son approximately thirty times. Father's visitation with J.J.B. ceased in April 1992, when the woman employed by Petitioners to accompany J.J.B. during the visits refused to supervise any further visits. Father was told by Petitioners that he would have to make other arrangements to have someone accompany J.J.B. during the visits.
Final hearing was held on August 3-4, 1992. At the conclusion of testimony, the trial court granted the petition for adoption and ordered that Father's parental rights be terminated. Subsequent to the submission of requested findings of fact and conclusions of law, the trial court entered a decision, finding, among other things, that J.J.B. has not lived with Father since November 14, 1990; a parent-child relationship had developed between Petitioners and J.J.B.; that Father had not provided any support to J.J.B. or lived with J.J.B. since November *1259 14, 1990; and that it is in the best interests of J.J.B. that he be adopted by Petitioners.
Based on its findings, the trial court concluded, in part, that "[c]lear and convincing evidence has established that the biological father has abandoned the [child], pursuant to [NMSA 1978, Section] 32-1-54(B)(4) [(Repl.Pamp.1989)]"; that "the parent-child relationship between the Child and the father has disintegrated"; that "a psychological parent-child relationship has developed between petitioners and the Child"; and "[c]lear and convincing evidence demonstrated that it is in the best interests of the physical, mental and emotional needs of the child that the biological father's parental rights be terminated pursuant to [Section] 31-2-54(A) [32-1-54(A)] NMSA 1978." Thereafter, the trial court entered a final decree terminating Father's parental rights and granting the adoption.

TERMINATION OF FATHER'S PARENTAL RIGHTS
In the Children's Code, NMSA 1978, Sections 32-1-1 to -59 (Repl.Pamp.1989), Section 32-1-54(B) sets out four alternative grounds for terminating parental rights.[1] In addition, at the time of the proceedings below, the Adoption Act, NMSA 1978, Sections 40-7-29 to -61 (Repl.Pamp.1989), contained a provision (Section 40-7-36(A)) specifying that consent to adoption or a relinquishment of parental rights for the purposes of adoption shall be implied if a parent "without justifiable cause" has, among other things, left a child with others for a designated period of time "without provisions for support and without communication."[2] Section 40-7-36(A)(2).
The trial court's judgment and decree in the instant case stated that the court found the "allegations of the First Amended Petition for Adoption [to have been] established." The petition filed by Petitioners alleged that Father's consent should be dispensed with (1) under Section 32-1-54(B)(1) (abandonment of child), and (2) under Section 32-1-54(B)(4) (presumptive abandonment of child).
In adopting its conclusions of law, the trial court concluded that Father failed to rebut a presumption of abandonment, that he impliedly consented to placement of his child with La Familia, and that it is in the best interests of the child that Father's parental rights "be terminated pursuant to [Section] 31-2-54(A) [sic] [32-1-54(A)] NMSA 1978."
The trial court's judgment appears to be influenced by an error of law because there is no express finding of fact indicating that Father either intended to abandon J.J.B. or that Father was an unfit parent. The trial judge's oral remarks at the conclusion of the trial indicated that he did not believe that Father was an unfit parent.[3] However, even if we disregard these oral remarks and construe the trial court's findings as implicitly determining that Father was unfit, the record fails to contain sufficient evidence to establish by the standard of clear and convincing evidence that Father is unfit. Grounds for termination must be supported by clear and convincing evidence. Section 32-1-55(H); see also In re R.W., 108 *1260 N.M. 332, 336, 772 P.2d 366, 370 (Ct.App.), cert. denied, 108 N.M. 273, 771 P.2d 981 (1989).
In examining whether the trial court's decision was affected by an error of law, we first inquire whether Father's parental rights were subject to termination under the presumptive abandonment statute, Section 32-1-54(B)(4), in the absence of a determination of parental unfitness.
Section 32-1-54 provides[4]:
A. The rights of a parent, including an adjudicated, acknowledged, biological, presumed or adoptive parent, may be terminated with reference to a child by the court as provided in this section. In proceedings to terminate parental rights, the court shall give primary consideration to the physical, mental and emotional welfare and needs of the child.

B. The court shall terminate parental rights with respect to a minor child when:
(1) the minor has been abandoned by the parents;
(2) the minor has been left under such circumstances that the identification of the parents is unknown and cannot be ascertained, despite a diligent search by the department and the parents have not come forward to claim the minor for three months;
(3) the child has been a neglected or abused child as defined in Section 32-1-3 NMSA 1978 and the court finds that the conditions and causes of the neglect and abuse are unlikely to change in the foreseeable future despite reasonable efforts by the department or other appropriate agency to assist the parent in adjusting the conditions which render the parent unable to properly care for the child; or
(4) the child has been placed in the care of others, including care by other relatives, either by a court order or otherwise and the following conditions exist:
(a) the child has lived in the home of others for an extended period of time;
(b) the parent-child relationship has disintegrated;
(c) a psychological parent-child relationship has developed between the substitute family and the child;
(d) if the court deems the child of sufficient capacity to express a preference, the child prefers no longer to live with the natural parent; and
(e) the substitute family desires to adopt the child.
C. A finding by the court that all of the conditions set forth in Paragraph (4) of Subsection B of this section exist shall create a rebuttable presumption of abandonment.

D. The termination of parental rights involving a child subject to the Indian Child Welfare Act, 25 U.S.C. Sections 1901 et seq., shall comply with the requirements of that act.
E. The definitions contained in Section 2 of the Adoption Act [40-7-30 NMSA 1978] shall apply to the termination of parental rights under this section and Section 32-1-55 NMSA 1978. [Emphasis added.]
In determining whether Father's parental rights can be terminated absent a showing of parental unfitness, we review two related but distinct principles: the fundamental liberty interest of a natural parent to the care, custody, and management of his or her child, see Santosky v. Kramer, 455 U.S. 745, 753, 760, 102 S.Ct. 1388, 1394, 1398, 71 L.Ed.2d 599 (1982); Stanley v. Illinois, 405 U.S. 645, 651, 658, 92 S.Ct. 1208, 1212, 1216, 31 L.Ed.2d 551 (1972), and the state's legitimate concern for the best interests and welfare of the child, see In re Samantha D., 106 N.M. 184, 186, 740 P.2d 1168, 1170 (Ct.App.), cert. denied (Aug. 14, 1987); Sorentino v. Family & Children's Soc'y, 74 N.J. 313, 378 A.2d 18, 21 (1977).
*1261 Father, the American Civil Liberties Union, and the Children, Youth & Families Department (the Department) all assert that absent a showing that the parents are unfit, parents have a fundamental constitutional right to raise their children.[5] We agree. See, e.g., Stanley, 405 U.S. at 651, 92 S.Ct. at 1212. In Jaramillo v. Jaramillo, 113 N.M. 57, 64, 823 P.2d 299, 306 (1991), our Supreme Court also recognized the fundamental nature of a parent's right to raise his child.
"[F]reedom of personal choice in matters of family life is a fundamental liberty interest." Santosky v. Kramer, 455 U.S. 745, 753, [102 S.Ct. 1388, 1394, 71 L.Ed.2d 599]... (1982) (requiring stringent standards for termination of parental rights). This freedom of personal choice includes "the freedom of a parent and child to maintain, cultivate, and mold their ongoing relationship." Franz v. United States, 707 F.2d 582, 595 (D.C.Cir.1983)....
Id. In In re Ronald A., 110 N.M. 454, 455, 797 P.2d 243, 244 (1990), our Supreme Court additionally observed that "[a] parent's right in custody is constitutionally protected, Stanley v. Illinois, 405 U.S. 645 [92 S.Ct. 1208, 31 L.Ed.2d 551] ... (1972), and actions to terminate that right must be conducted with scrupulous fairness...." This rule recognizes the presumption that placement with the natural parent is actually in the child's best interest. Shorty v. Scott, 87 N.M. 490, 493, 535 P.2d 1341, 1344 (1975). Similarly, in Santosky, 455 U.S. at 760, 102 S.Ct. at 1398, the United States Supreme Court has said that "until the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship." Because a parent's right to the care and custody of his or her child is constitutionally protected, the state may not infringe upon such right without a compelling reason. See Hawk v. Hawk, 855 S.W.2d 573, 577 (Tenn.1993).
The Department agrees with Father that the trial court erred in terminating Father's parental rights without a showing of parental unfitness. In furtherance of this argument, the Department asserts:
Even though the Supreme Court recognizes the importance of the welfare of the child as a factor in this determination, the standard applied is the father's "fitness" as opposed to a "best interest" comparison of the potential adoptive parent with the biological father.... The "best interest" balancing test to determine a child's appropriate placement is triggered only after the biological parent is determined to be unfit or absent....
We find this argument persuasive. Absent evidence indicating that Father was unfit by reason of his having presumptively abandoned J.J.B., it was not appropriate to compare the placement of the child with the potential adoptive parents and the placement of the child with the biological father. See, e.g., In re Adoption of Doe, 89 N.M. 606, 619, 555 P.2d 906, 919 (Ct.App.), cert. denied, 90 N.M. 7, 8, 558 P.2d 619, 620 (1976); see also Nevelos v. Railston, 65 N.M. 250, 254, 335 P.2d 573, 576 (1959) (court should not consider merits or demerits of adoption petition insofar as it concerns welfare of child, unless it has first determined that consent of natural parent may be dispensed with); In re Appeal in Maricopa County Juvenile Action No. JS-500274, 167 Ariz. 1, 5, 804 P.2d 730, 734 (1990) (en banc) (best interests of child are a necessary, but not exclusively sufficient, condition for an order of termination).
As observed by this Court in In re Mary L., 108 N.M. 702, 705, 778 P.2d 449, 452 (Ct.App.), cert. denied, 108 N.M. 713, 778 P.2d 911 (1989), "[i]n a dispute between the natural parent and third parties concerning the custody of a child, the natural parent is entitled to custody of the child unless the third party makes an affirmative showing that the parent is unfit." Thus, only after determining that a parent is unfit should the court consider whether the child's best interests require placement with someone other *1262 than that parent, and balance those interests against the parent's interests. See Santosky, 455 U.S. at 767 n. 17, 102 S.Ct. at 1402 n. 17; see also Huey v. Lente, 85 N.M. 585, 592, 597, 514 P.2d 1081, 1088, 1093 (Ct.App.) (Hernandez, J., specially concurring), rev'd on other grounds, 85 N.M. 597, 514 P.2d 1093 (1973); In re Kristina L., 520 A.2d 574, 579-80 (R.I.1987). Of course, we recognize that a child's interests factor into a determination of parental unfitness. However, an independent consideration of the child's interests in the placement with, or adoption by, a third party should occur only if the natural parent is deemed unfit.
In Quilloin v. Walcott, 434 U.S. 246, 255, 98 S.Ct. 549, 555, 54 L.Ed.2d 511 (1978) (quoting Smith v. Organization of Foster Families, 431 U.S. 816, 862-63, 97 S.Ct. 2094, 2119, 53 L.Ed.2d 14 (1977) (Stewart, J., concurring in judgment)), the Supreme Court stated:
We have little doubt that the Due Process Clause would be offended "[i]f a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest."
Reviewing the trial court's findings, together with its oral comments, we believe the court erred in terminating Father's parental rights absent a showing that Father either consented to the adoption or that he was an unfit parent by reason of having presumptively abandoned J.J.B. See Walker v. L.G. Everist, Inc., 102 N.M. 783, 791, 701 P.2d 382, 390 (Ct.App.) (findings of fact induced by error of law cannot stand), cert. denied, 105 N.M. 94, 728 P.2d 845 (1985). Although the oral statements of a judge do not constitute a final order, Balboa Construction Co. v. Golden, 97 N.M. 299, 304, 639 P.2d 586, 591 (Ct.App.1981), nevertheless, the court's statements are instructive in determining the court's intent where an ambiguity exists in the court's decision. See Ledbetter v. Webb, 103 N.M. 597, 604, 711 P.2d 874, 881 (1985).
We next examine whether a sufficient evidentiary basis existed to permit termination of Father's parental rights on the grounds of neglect or presumptive abandonment.

A. Fitness of Father

1. Neglect

Although neglect was not expressly alleged in Petitioners' amended petition as a basis for terminating Father's parental rights, the trial court found, among other things, that Father had not provided any support for J.J.B. since November 14, 1990, and that he "either neglected to provide necessary care to [J.J.B.] or neglected to see that such care was provided by [Mother]."
Apart from the fact that this ground was not expressly alleged by Petitioners, we think any finding of neglect on the part of Father must also fail for the following reasons. Section 32-1-54(B)(3) requires, in addition to a finding of neglect as defined in Section 32-1-3, a finding that the conditions and causes of neglect are unlikely to change in the foreseeable future despite reasonable efforts by the Department or other appropriate agencies to assist the parent in adjusting the conditions that render the parent unable to properly care for the child. In this case, even if we were to assume arguendo that Petitioners established by clear and convincing evidence that Father neglected J.J.B., there was no evidence of any efforts by the Department or other agency to assist Father in caring for his son. Nor was there any showing that such efforts would have been futile. See In re Kenny F., 109 N.M. 472, 476, 786 P.2d 699, 703 (Ct.App.1990). Our examination of the record, however, indicates that the record fails to contain sufficient evidence to support a finding, by clear and convincing evidence, that Father neglected J.J.B.
The term "neglected child" is defined in Section 32-1-3(L) of the Children's Code as follows:
"[N]eglected child" means a child:
(1) who has been abandoned by his parent, guardian or custodian;

*1263 (2) who is without proper parental care and control or subsistence, education, medical or other care or control necessary for his well-being because of the faults or habits of his parent, guardian or custodian or the neglect or refusal of the parent, guardian or custodian, when able to do so, to provide them;

(3) who has been physically or sexually abused, when the child's parent, guardian or custodian knew or should have known of the abuse and failed to take reasonable steps to protect the child from further harm;
(4) whose parent, guardian or custodian is unable to discharge his responsibilities to and for the child because of incarceration, hospitalization or other physical or mental disorder or incapacity; or
(5) who has been placed for care or adoption in violation of the law.... [Emphasis added.]
Termination of parental rights by reason of neglect requires a showing by clear and convincing evidence of culpability on the part of the parent through intentional or negligent disregard of the child's well-being and proper needs. See In re Doe, 98 N.M. 198, 201, 647 P.2d 400, 403 (1982) (neglected child is one who is without proper parental care and control necessary for child's well-being because of parents' faults or neglect); see also In re Mary L., 108 N.M. at 705, 778 P.2d at 452 (where custodial parent has neglected child, noncustodial parent is not merely a placement alternative; instead, he is entitled to custody unless he is shown to be unfit).
Petitioners argue that the trial court's findings support a determination that Father was unfit, because there was evidence that the child was seriously neglected while he lived with his father and mother as well as when he lived with his mother following the separation of his parents. Petitioners note that under our case law Father may not "escape responsibility for the child's condition by protesting that the neglect was the fault of Ms. Medina." See In re C.P., 103 N.M. 617, 622, 711 P.2d 894, 899 (Ct.App.) ("A father may not delegate parental obligations to the mother and be held harmless when she neglects these obligations."), cert. denied, 103 N.M. 525, 710 P.2d 92 (1985). Although we agree that Petitioners have correctly interpreted In re C.P., the facts of the present case are clearly distinguishable.
The record indicates that J.J.B. was in Mother's care following the separation of his parents, and that Mother and the three children were living in the home of her father. The record also indicates that during his December 1990 visit with the children, although he was unemployed, Father provided Mother with additional food stamps. He also communicated by telephone with Mother concerning the children.
Where the parents are separated and living in different communities, in order to hold Father responsible for the neglect of the parent having actual physical custody of the child, Petitioners must establish that Father knew or should have known of the condition of the child, and that the child was without proper care of a parent "because of the faults or habits of his parent ... or the neglect or refusal of the parent ... when able to do so, to provide them." Section 32-1-3(L)(2) (emphasis added). Here, the record does not support a determination, by clear and convincing evidence, that J.J.B. was neglected while living with Father, or that Father knew or should have known that J.J.B. was neglected by Mother between the time that Father visited with the family on December 6, 1990, and January 4, 1991, when Father learned that his son had been placed by Mother with La Familia. Nor does the record contain a finding that Father was able to provide support but neglected or refused to do so.

2. Presumptive Abandonment

The trial court concluded that all of the elements of the presumptive abandonment statute, Section 32-1-54(B)(4), had been established by clear and convincing evidence *1264 and that Father had failed to meet his burden to rebut the presumption of abandonment. As discussed above, however, termination of parental rights on grounds of the child's interests alone, absent a showing of parental unfitness, fails to satisfy constitutional due process. See Quilloin, 434 U.S. at 255, 98 S.Ct. at 555.
Petitioners argue that other precedent appears to indicate that termination of parental rights is not contingent upon the trial court first finding that a parent is unfit. In In re Kenny F., 109 N.M. at 479, 786 P.2d at 706, the mother's parental rights were terminated both on the grounds of neglect and under Section 32-1-54(B)(4) (disintegration of parent-child relationship). The mother did not contest allegations of neglect in an earlier proceeding, and the child in question was left in long-term foster care. Although language in In re Kenny F. suggests that termination of parental rights under former Section 32-1-54(B)(3)-(4) does not require proof that a parent is unfit, the court also noted that the term "`unfit' ... might be an apt appellation for a parent whose rights with respect to a child are terminated pursuant to Section 32-1-54(B)(3)." In re Kenny F., 109 N.M. at 479, 786 P.2d at 706. We do not believe that the legislature intended to permit termination of parental rights under the circumstances presented here. A contrary interpretation would render Section 32-1-54(B)(4) subject to constitutional challenge. See Santosky, 455 U.S. at 760, 102 S.Ct. at 1398; Quilloin, 434 U.S. at 255, 98 S.Ct. at 555. To the extent language in In re Kenny F. is inconsistent with our holding in the instant case, it is overruled.
It is the duty of a court to interpret a statute in a way that will make it constitutionally sound. See Seidenberg v. New Mexico Bd. of Medical Examiners, 80 N.M. 135, 138-39, 452 P.2d 469, 472-73 (1969) (in determining constitutionality of legislation, there is a presumption the legislature performed its duty and kept within bounds fixed by constitution, and judiciary will, if possible, give effect to the legislative intent unless it clearly conflicts with the constitution). Thus, we interpret Section 32-1-54 in light of the constitutional requirement that parental unfitness must be first determined before independently considering the child's interests.
Because the record does not support a finding that Father was unfit, the decision to terminate Father's parental rights cannot stand. In the instant case, Father immediately protested the placement of J.J.B. with La Familia and demanded his return. There was no effort by that agency or by the Department to reunite J.J.B. with Father. Thus, the fact that J.J.B. lived in the home of Petitioners for an extended period of time and a psychological parent-child relationship has developed is not a valid basis to terminate Father's parental rights under Section 32-1-54(B)(4).
Nor do we believe that Shorty, 87 N.M. 490, 535 P.2d 1341; In re Samantha D., 106 N.M. 184, 740 P.2d 1168; or In re Jason Y., 106 N.M. 406, 408, 744 P.2d 181, 183 (Ct.App. 1987), support a contrary interpretation of Section 32-1-54(B)(4). Although there is language in In re Samantha D., 106 N.M. at 186, 740 P.2d at 1170, and In re Jason Y., 106 N.M. at 408, 744 P.2d at 183, which indicates that parents do not have an absolute right to their children and that such right is secondary to the best interests and welfare of the children, the language in question is not controlling here. In both of those cases, the parents were found to be unfit on grounds of abandonment or neglect before the best interests of the child were weighed against the parents' interests. In Shorty, 87 N.M. at 493, 535 P.2d at 1344, the Court held that where there is a custody dispute involving a minor child between a natural parent and a third party, there is a presumption that the welfare and best interests of the child are best served by continuing the child's custody with the natural parent. Id. The burden of overcoming this presumption is on the third party. Id. The Court further stated:
The rule also requires that the trial court make express findings, if the natural *1265 parent is to be denied custody, not only that the parent is unfit, but that the third person seeking to obtain or retain custody is fit and the welfare and best interests of the child would best be served by giving custody to that third person.
87 N.M. at 494, 535 P.2d at 1345 (emphasis added) (footnotes omitted). Since Petitioners have failed to establish by clear and convincing evidence that Father was unfit, the decision in Shorty is not inconsistent with the result reached here.
Petitioners also rely on In re Adoption of Doe, 98 N.M. 340, 648 P.2d 798 (Ct.App.), cert. denied, 98 N.M. 336, 648 P.2d 794 (1982). In In re Adoption of Doe, the natural mother signed an informal contract by which she agreed that her former husband (who was not the natural father of the child) would have custody of the child for an indefinite period. Id. at 342, 648 P.2d at 800. The natural mother expressly sought to retain her parental rights and rights of visitation under the contract. Id. In that case the natural mother did not contest that her child had been left with her former husband for almost five years. Id. In upholding the termination of the natural mother's parental rights, this Court recognized that children cannot be left indefinitely in long-term foster care. Id. at 347, 648 P.2d at 805. Contrary to the facts in the instant case, the court in In re Adoption of Doe determined that the natural mother expressly agreed to the placement of her child with her ex-husband for an extended period, and that termination of the mother's parental rights was established under the provisions of former NMSA 1978, Section 40-7-4(B)(4) (Supp.1981) by clear and convincing evidence.[6]In re Adoption of Doe, 98 N.M. at 344-45, 648 P.2d at 802-03. Such evidence is lacking here. In the instant case Father did not place or agree to place his child with Petitioners, and he actively sought to regain custody of J.J.B.
Thus, we conclude that the trial court here erred in terminating Father's parental rights on the basis of presumptive abandonment.

B. Implied Consent

The trial court also adopted findings, inter alia, determining:
18. Except for one visit in December of 1990, the ... father did not have any contact with the Child from November 15, 1990 until November 23, 1991, when he resumed visitation at Petitioner's [sic] expense.
19. The ... father has not provided any support to the Child since the Child left Tucson, Arizona on November 14, 1990.
Based upon its findings, including Nos. 18 and 19, set out above, the trial court concluded that Father "impliedly consented to and acquiesced in the placement and continued custody of the Child with La Familia."
Under Section 40-7-36(A)(2)(a):
A. A consent to adoption or relinquishment of parental rights required by Section 7 [40-7-35 NMSA 1978] of the Adoption Act shall be implied by the court if the parent without justifiable cause has:
....
(2) left the adoptee with others, including the other parent or an agency, without provisions for support and without communication for a period of:
(a) three months if the adoptee was under the age of six years at the commencement of the three-month period.... [Emphasis added.]
An order granting a decree of adoption and dispensing with a parent's consent to adoption based upon a conclusion that a parent has impliedly consented to an adoption pursuant to Section 40-7-36(A)(2), and which conclusion is predicated, in part, upon a failure of such parent to provide for the support and to communicate or maintain contact with the child during a three-month period, must also determine whether the failure of the parent to support and communicate with the child during such period was *1266 "without justifiable cause." Id.; see also In re Adoption of Masa, 23 Ohio St.3d 163, 492 N.E.2d 140, 142 (1986).
Here, the trial court found that Father was indigent on August 21, 1991, and ordered that court-appointed counsel be appointed to represent him. However, the record indicates that Father lost his job shortly after he separated from Mother and was unemployed at the time of the filing of the petition for adoption. Considering Father's indigent status, his continued objections to his son's adoption, his efforts through counsel to obtain visitation, and his written demand on March 14, 1991, for the return of J.J.B., we are unable to say that Petitioners established by clear and convincing evidence that Father has impliedly consented to the child's adoption.
Petitioners also argue that under Section 40-7-51(C), that even if the order terminating parental rights is reversed, the case should be remanded for a determination of which party should be awarded custody of J.J.B., based on a determination of the best interests of the child. Absent a determination that Father is unfit, there is no basis to deprive Father of his son's custody. See In re Mary L., 108 N.M. at 705, 778 P.2d at 452.

CONCLUSION
The judgment dispensing with Father's consent, terminating his parental rights, and granting the petition to adopt J.J.B. is reversed. We remand with directions for the trial court to restore custody of J.J.B. to the Natural Father, taking steps to minimize the emotional trauma to the child and the parties.[7]
IT IS SO ORDERED.
MINZNER, C.J., and BIVINS, J., concur.
NOTES
[1] The judgment and decree of adoption entered by the trial court in the present case granted the adoption and ordered that "[t]he rights of the biological father are terminated pursuant to [Section] 32-1-54 NMSA 1978, and his consent is therefore not required pursuant to [NMSA 1978, Section] 40-7-34(A) [sic] [40-7-36 (Repl. Pamp.1989)]."
[2] Section 40-7-36(A), in effect at the time of the filing of Petitioners' petition, subject to proof of each statutory element, permitted a finding of implied consent or relinquishment for adoption by a parent whose consent was required under Section 40-7-35. This section was subsequently repealed and reenacted by 1993 N.M.Laws, ch. 77, § 145 as Section 32A-5-18.
[3] In announcing his ruling, the trial judge stated that if he had been the first judge assigned in the case and Father had made "a motion for immediate custody there is no question in my mind that I would have ordered that [the child] be turned back to you. I think most other trial judges would have done the same." The trial judge also stated, "I go back to [Father] and I know what his position is. I certainly don't see him as being an unfit parent. I'm not going to make [a] finding that he was an unfit parent."
[4] During the pendency of this appeal, the legislature repealed Section 32-1-54 and reenacted a similar provision as Section 32A-5-15. See 1993 N.M.Laws, ch. 77, § 142.
[5] Two decisions from other jurisdictions concerning somewhat factually analogous situations have recently received extensive national media coverage. See In re B.G.C., 496 N.W.2d 239 (Iowa 1992) In re Clausen, 442 Mich. 648, 502 N.W.2d 649 (1993).
[6] Compare Section 32-1-54(B)(4) (Repl. Pamp.1989).
[7] At oral argument, counsel for the Department indicated that the Department would provide an expert (psychologist or psychiatrist) to develop a plan to reunite J.J.B. with the natural father and to take such other steps as would minimize the emotional trauma to all parties.