894 P.2d 994

In the Matter of the ADOPTION
OF J.J.B., a minor.

Carla Ann ROTH and Kyle David Franz
Roth, Petitioners–Petitioners,

v.

Edward BOOKERT, Respondent–
Respondent.

No. 21864.

Supreme Court of New Mexico.

March 30, 1995.

Cynthia A. Fry, Martha J. Kaser, Albuquerque, for petitioner.

Paul R. Cohen, Albuquerque, for respondent.

Ella Joan Fenoglio, Albuquerque, guardian ad litem.

Tom Udall, Atty. Gen., Diane Garrity, Sp. Asst. Atty. Gen., Angela Adams, Chief Children's Court Atty., Santa Fe, for amicus curiae Children, Youth & Families Dept.

Albers & Albers, James S. Albers, Columbus, OH, for amicus curiae Nat. Council for Adoption.

Timothy V. Flynn–O'Brien, Fred Abramowitz, Phillip B. Davis, Reber Boult, Albuquerque, for amicus curiae ACLU–New Mexico.

Elizabeth Losee, Albuquerque, Lewis Pitts, Gayle Korotkin, Durham, NC, for amicus curiae Legal Action Project of Nat. Committee for Rights of the Child.

Law Offices of Daymon B. Ely, Daymon B. Ely, Albuquerque, for amicus curiae Nat. Child Rights Alliance.

## OPINION

FROST, Justice.

This case involves the contested adoption of a child placed for adoption by his mother without the knowledge of the child's father from whom she was separated. The case came to trial only after considerable delay, and after the child had lived for over one and one half years in the home of the couple seeking to adopt him. During this period of time the father had been able to secure only limited visitation with the child. After a trial on the merits, the district court concluded that the child had bonded with the couple seeking to adopt him and that it was in the child's best interest to remain with that couple. As a result, the court terminated the father's parental rights under New Mexico's "presumptive abandonment statute," NMSA 1978, § 32-1-54(B)(4) (Repl.Pamp.1989), *repealed by* 1993 N.M.Laws, ch. 77, § 234(A) (recompiled at NMSA 1978, § 32A-4-

28(B)(3) (Repl.Pamp.1993)); *see also* NMSA 1978, § 32A–5–15(B)(3) (Repl.Pamp.1993).[1]

The Court of Appeals reversed, stating that the record did not support a finding that the father was unfit, and that termination of parental rights on grounds of the child's interests alone, absent a showing of parental unfitness, fails to satisfy constitutional due process. *In re Adoption of J.J.B.*, 117 N.M. 31, 39, 868 P.2d 1256, 1264 (Ct.App.1993). We granted certiorari, 117 N.M. 121, 869 P.2d 820 (1994), and now hold that: (1) no separate showing or finding of unfitness is required for the termination of parental rights under Section 32–1–54(B)(4); (2) the presumption of abandonment established by the conditions set forth in Section 32–1–54(B)(4) may be rebutted by showing that a parent lacks responsibility for the disintegration of the parent-child relationship; and, (3) because the record in this case uniformly indicates that the father bore little, if any, responsibility for the disintegration of the parent-child relationship, any presumption of abandonment that arose was rebutted as a matter of law. Although we overrule the Court of Appeals in its treatment of the presumptive abandonment statute, we affirm its judgment on other legal grounds.

## I. FACTS

Because this case involves the involuntary termination of parental rights, and because there are considerable discrepancies in the briefs submitted by the parties regarding certain important events, we review the factual testimony and proceedings below in some detail.

Edward Bookert and Anna Medina lived together for about ten years but never married. The couple had two daughters, now fourteen and five years old, and one son, J.J.B., now four. Bookert is named as the father on each of their birth certificates. During the ten years the couple lived together, Bookert worked to support the family.

Medina, for the most part, worked only in the home caring for the children.

In August 1990, when J.J.B. was about four months old, the family was having serious financial problems. For some time Bookert had been unable to find employment that paid more than $4.25 per hour and their cash income was less than $600 a month. They supplemented this income with food stamps. Bookert, hoping to find a better paying construction job, drove with the entire family to Laughlin, Nevada. He failed to quickly find a job in Laughlin, however, and within three days the family drove to Tucson, Arizona, where Bookert had a brother. They decided to stay and rented an apartment. Bookert found work at a hotel doing maintenance work and driving a shuttle van.

Medina was unhappy in Tucson and her relationship with Bookert deteriorated. After a few months she wanted a separation and to return to Albuquerque. Bookert sought to dissuade her from going but eventually he acquiesced with her desire to leave. He purchased plane tickets for Medina and the children, and gave her about $100 in cash. She also took the family's supply of food stamps, worth about $300. On November 14, 1990, Medina and the children flew to Albuquerque and stayed in her father's apartment. Bookert called that evening to make certain that they had arrived. Shortly thereafter, he sent packages that contained clothing and other personal items that were left behind in Tucson.

About two weeks later Bookert lost his job. On December 6, 1990, he returned to Albuquerque and drove to Medina's residence. He brought more of the family's personal items and gave Medina additional food stamps worth about $75. He spent about half a day at the apartment playing with the two younger children and waiting for the eldest child to come home from school. However, Medina was angry that Bookert hadn't called them since the night they had first arrived, and the couple resumed their

---

1. As noted, all the applicable statutes from the Children's Code, NMSA 1978, Sections 32–1–3 & –54 (Repl.Pamp.1989), and the Adoption Act, NMSA 1978, Sections 40–7–35, –36, –37, & –49 (Repl.Pamp.1989) were repealed by 1993 N.M.Laws, ch. 77, § 234. However, the current recompiled versions of these statutes are essentially the same as the statutes they replaced. Our analysis in this opinion applies to both the current and previous versions of these statutes.

arguing. Eventually he left when Medina told him she didn't want him around. Bookert testified that he had no place to stay in Albuquerque because his trailer in nearby Tijeras Canyon, where the family had lived previously, had been repossessed. He drove to Hobbs to stay with his mother while he looked for work. He told Medina he would return in the latter part of December.

During the next few weeks he called the family by telephone from Hobbs on a number of occasions. The oldest daughter also called him. Medina spoke with him at first, but eventually she refused to do so and thereafter he spoke only with the children. As Christmas approached he sought to have the oldest daughter fly to Hobbs for the holidays and then afterward return with him to Albuquerque, but Medina refused to let her go. For Christmas he sent the children gifts, including a bicycle for the oldest girl. Bookert testified that he sent $40 to Medina during this period of time, but Medina denied receiving it.

About the first of the year Medina decided to place J.J.B. for adoption. She testified[2] that she was upset with Bookert because they were breaking up, and that she couldn't handle three children. She stated that she didn't tell Bookert what she was planning to do because she was mad at him. On January 4, 1991, she contacted La Familia Adoption Agency (La Familia) and authorized it to place the child for adoption. Medina relinquished her parental rights to the agency and gave the agency the child that same afternoon. She informed Gerald Ortiz y Pino, her contact person at the agency, that Bookert had abandoned the family.

That same day, January 4, Ortiz y Pino called Bookert in Hobbs. Ortiz y Pino informed him that Medina had delivered his son, J.J.B., to the agency and authorized the agency to place the child for adoption. Ortiz y Pino wanted to know if Bookert would consent to the adoption. Bookert testified

that his reaction was shock and disbelief. He told Ortiz y Pino that he would not agree to the adoption and that he would be coming to Albuquerque in a day or two to get the boy.

Bookert's son, J.J.B., was placed by La Familia with prospective adoptive parents, Carla and Kyle Roth (the Roths), on the same day that Medina relinquished her parental rights to the agency, Friday, January 4, 1991. Ortiz y Pino testified that the child was placed with the Roths because they were willing to take the child that same day under the cloud of a possible challenge by the boy's father.

Bookert left Hobbs the next day, January 5, and arrived in Albuquerque early Sunday morning. He testified that he called Ortiz y Pino on Monday, let him know that he was there to pick up the boy, and made an appointment to meet Ortiz y Pino the next day, January 8, 1991. When they met the next day Ortiz y Pino refused to turn over the boy, and he advised Bookert to hire an attorney if he wished to contest the adoption.

The testimony of Ortiz y Pino is consistent with that of Bookert's on this point: that Bookert specifically and repeatedly requested that the child be immediately turned over to him.[3] When asked if Bookert requested on January 4 that the child be given to him, Ortiz y Pino testified: "Yes, he did. He said he was the father of the baby; that he was willing to bring the child up; that his mother could help him, or that if he found work in Albuquerque that he could make arrangements, that he could bring the baby up himself." Ortiz y Pino further testified that when Bookert came to Albuquerque, "He got in touch with us again, requested that we produce [J.J.B.], turn him over to him. He did not want the adoption to go through. He wanted his son back."

On January 9, 1991, Ortiz y Pino wrote Bookert a letter that reviewed their conver-

---

**2.** Medina was unable to be served with a subpoena ordering her to testify at trial. Her deposition was admitted into evidence.

**3.** Attorneys for the petitioners seeking the adoption of J.J.B. have asserted in their brief to this Court that Bookert failed to request that the child

be turned over to him, but instead requested that the child be returned to Medina or turned over to Bookert's mother to raise, and that Bookert himself would take the child *only* in the event Medina and his own mother refused to do so. These assertions are not supported by the record.

sations of January 4, 7, and 8. The letter acknowledged that Bookert refused to cooperate with the adoption, and that Bookert had asserted that he wished to bring the boy up himself, possibly with the help of Bookert's mother in Hobbs.[4] Ortiz y Pino again advised Bookert to seek legal advice. Bookert was also told that if he decided to cooperate with the adoption plan, he should call and arrange to relinquish his parental rights. Ortiz y Pino testified that he assumed that Bookert would eventually consent to the adoption.

After consulting with the State Bar referral service, Bookert engaged an attorney in Albuquerque to represent him. On January 18, 1991, this attorney wrote La Familia advising them of his representation. He stated that Bookert wanted to do everything in his power to keep his children together and the attorney asked to be kept informed. He appears to have taken no further action on Bookert's behalf.

Five days later, on January 23, 1991, the Roths filed a petition to adopt J.J.B. The petition alleged that Bookert's consent to the adoption was not required under NMSA 1978, Section 40–7–36 (Repl.Pamp.1989), repealed by 1993 N.M.Laws, ch. 77, § 234(E) (recompiled as amended at NMSA 1978, § 32A–5–18 (Repl.Pamp.1993)), which, in pertinent part, authorizes the court to imply parental consent to adoption under circumstances where the parent, without justifiable cause, has left a child for three months without provisions for support and without communication. No notice of pendency of the adoption proceedings was served on Bookert or his attorney as was required by statute. See § 40–7–36(B).

On March 12, 1991, the Roths filed a First Amended Petition for Adoption. The amended petition added the allegation that, as a biological parent who had not established a custodial, personal, or financial relationship with the child, Bookert's consent to the adoption was not required under NMSA 1978, Section 40–7–35(A)(4) (Repl.Pamp.1989), repealed by 1993 N.M.Laws, ch. 77, § 234(E) (recompiled as amended at NMSA 1978, § 32A–5–17 (Repl.Pamp.1993)). A copy of this petition appears to have been mailed to Bookert's attorney shortly after it was filed.

About this same time, early March, Medina apparently agreed to assist Bookert in seeking the return of the child, and they engaged another attorney to represent both of them and to write a demand letter to La Familia. The letter was hand delivered to La Familia on March 14, 1991. The letter stated that the attorney represented both Bookert and Medina, and demanded that La Familia return custody of the child to them. Ortiz y Pino testified that he took no action on the letter other than to turn it over to the Roths' attorney.

On April 4, 1991, Bookert and Medina both filed responses to the petition for adoption. Bookert appeared pro se, Medina through counsel. Medina claimed her relinquishment was invalid. Bookert claimed he had openly held out the child as his own and had established a custodial, personal, and financial relationship with him, and although he was not living with Medina, he had never abandoned his children. Both parties requested the return of the child to his natural parents.

On April 9, 1991, Medina filed a motion to change interim physical custody to herself pending the outcome of the proceedings. A hearing on this motion was heard on May 15, 1991. The court denied Medina's motion for a change of custody, and also denied the oral motion of Bookert, appearing pro se, for visitation with his son. The court then postponed further proceedings until Bookert had obtained court-appointed counsel.[5]

---

4. The relevant section of the letter is as follows:

In our conversations together you have asserted that you want to bring up [J.J.B.] yourself—possibly with the help of your mother, Mrs. Mardis Berry, age 63, who lives in Hobbs and is in good health. You said you had been a good provider for your family until you were laid off from your job in Tucson just after Ana and the children left that city to return to Albuquerque. And you have said you know you will not have any difficulty finding employment, either here or in Hobbs. Once you are employed, you believe you will be able to find suitable child care for [J.J.B.] while you are at work.

5. The attorney hired to represent both Medina and Bookert entered an appearance only on behalf of Medina but assisted Bookert with the

On May 22, 1991, the Roths filed a Second Amended Petition for Adoption and Termination of Parental Rights. This petition added the allegation that Bookert had failed to support the child and had abandoned him, and requested the termination of Bookert's parental rights. Termination of parental rights eliminates the need for that parent's consent to any proposed adoption. NMSA 1978, § 40–7–37(A) (Repl.Pamp.1989), *repealed by* 1993 N.M.Laws, ch. 77, § 234(E) (recompiled as amended at NMSA 1978, § 32A–5–19 (Repl.Pamp.1993)).

On June 7, 1991, court-appointed counsel for Bookert entered an appearance on his behalf, and on July 1, 1991, this attorney filed a motion requesting visitation for Bookert with his son. Before the motion was heard, however, the trial court judge recused himself and the case was reassigned. Shortly thereafter Medina and her father approached the judge newly assigned to the case, apparently under the misimpression that they could obtain a court order from him returning custody of the child, and after this ex parte contact this judge also recused himself. The case was reassigned to Judge John Brennan on September 3, 1991, and the court granted Bookert's motion for interim visitation on November 14, 1991.

Starting on November 23, 1991, Bookert was allowed to be with his son, for a period of 45 minutes at a time, while accompanied by a nanny who worked for the Roths. Bookert's other children were not allowed to be present. Bookert had approximately thirty court-ordered visits with the boy over the next five months. The visitation stopped when the nanny refused to participate further after a dispute arose between Bookert and the nanny about whether he could be alone with the boy. Bookert's attempts to make other arrangements for visitation were unsuccessful.

On December 13, 1991, the Roths filed a First Amended Verified Petition for Adoption and Termination of Parental Rights. In addition to a claim of abandonment under NMSA 1978, Section 32–1–54(B)(1) (Repl. Pamp.1989), *repealed by* 1993 N.M.Laws, ch. 77, § 234(A) (recompiled at NMSA 1978, § 32A–4–28(B)(1) (Repl.Pamp.1993)), this petition added the new allegation that Bookert's parental rights should be terminated under Section 32–1–54(B)(4), the presumptive abandonment statute.

Medina was dismissed as a party by stipulation a few days prior to a trial on the merits. The two day hearing on the merits was held on August 3 and 4, 1992. Following the trial, Judge Brennan ruled from the bench that the child was now bonded to the Roths and that it was in the child's best interests to remain with them. The judge stated that he certainly did not view Bookert as an unfit parent, and would make no finding to that effect. He also expressed doubt as to whether La Familia had any right to have refused to return the child to Bookert when they were first asked to do so. He then stated his decision to grant the petition for adoption and to terminate Bookert's parental rights under Section 32–1–54(B)(4). Thereafter, the court entered a final decree terminating Bookert's parental rights and granting the adoption.

## II. JUDGMENT BY THE COURT OF APPEALS

The Court of Appeals, in an opinion filed November 30, 1993, reversed the judgment granting the adoption, stating that the trial court's judgment "appears to be influenced by an error of law because there is no express finding of fact indicating that Father either intended to abandon J.J.B. or that Father was an unfit parent." *In re Adoption of J.J.B.*, 117 N.M. at 34, 868 P.2d at 1259. Citing *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212–13, 31 L.Ed.2d 551 (1972), the Court agreed with Amici [6] that

---

preparation of his pro se answer to the petition for adoption. He withdrew on July 18, 1991, from his representation of Medina due to a conflict of interest between Bookert and Medina and the fact that he had received confidential information from both of them. It is unclear from the record how or when Bookert's relationship with his first attorney was ended.

**6.** The Court of Appeals granted requests from the Children, Youth and Families Department and the American Civil Liberties Union (ACLU) to submit amicus briefs in support of Bookert. The

"absent a showing that the parents are unfit, parents have a fundamental constitutional right to raise their children." *In re Adoption of J.J.B.*, 117 N.M. at 36, 868 P.2d at 1261. In a similar vein, the Court quoted *Quilloin v. Walcott*, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978), which stated:

> We have little doubt that the Due Process Clause would be offended "[i]f a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest."

*Id.* at 255, 98 S.Ct. at 555 (quoting *Smith v. Organization of Foster Families*, 431 U.S. 816, 862–63, 97 S.Ct. 2094, 2119, 53 L.Ed.2d 14 (1977) (Stewart, J., concurring)).

The Court of Appeals concluded that the record did not support a finding that Bookert was unfit and, therefore, his parental rights could not be terminated. *In re Adoption of J.J.B.*, 117 N.M. at 39, 868 P.2d at 1264. In discussing whether the record showed that Bookert was unfit, the Court of Appeals appeared to require either a separate finding of parental unfitness, or evidence in the record to support such a finding separate and apart from the factors enumerated in the presumptive abandonment statute. *See generally id.* at 36–39, 868 P.2d at 1261–64. Citing *Santosky v. Kramer*, 455 U.S. 745, 760, 102 S.Ct. 1388, 1398, 71 L.Ed.2d 599 (1982), the Court indicated that a contrary interpretation of the presumptive abandonment statute would render it subject to a challenge on constitutional grounds. *In re Adoption of J.J.B.*, 117 N.M. at 39, 868 P.2d at 1264.

On January 5, 1994, the Court of Appeals, on motion by Bookert, issued a post-opinion visitation order. The Department of Children, Youth and Families was required to develop a plan permitting Bookert to maintain regular contact with his son "during the pendency of the appellate process."

## III. THE TERMINATION OF PARENTAL RIGHTS REQUIRES NO SEPARATE FINDING OF PARENTAL UNFITNESS

■ We briefly discuss *Stanley, Quilloin, Santosky,* and other related cases, because we think Amici and the Court of Appeals have misapplied certain broad statements in those cases with regard to a requirement for a determination of parental unfitness prior to terminating a parent-child relationship. These cases mandate no separate resolution of the issue of fitness when parental rights are terminated. Rather, as we shall explain below, under many circumstances, unfitness is implicitly rather than expressly established when proof is offered of conduct—such as abuse or abandonment—that justifies severing a parent from his or her child.

In *Stanley v. Illinois*, the State of Illinois sought to remove three children from the custody of their father after the death of the children's mother. 405 U.S. at 646, 92 S.Ct. at 1210. The couple had never married. Under Illinois law, the state could assume custody of the children of married parents, divorced parents, and unwed mothers only after a hearing and proof of parental neglect. *Id.* at 650, 92 S.Ct. at 1212. However, the more simplistic dependency proceedings applicable to the father under Illinois law after the death of the children's mother allowed the state to take the children from him without a hearing on his fitness and without proof of neglect. *Id.* The United States Supreme Court rejected arguments that the State of Illinois could simply presume the father's unfitness at law because he was unwed. *Id.* at 651–59, 92 S.Ct. at 1212–17. The Court held that, under the Due Process Clause, an unwed father is "entitled to a hearing on his fitness as a parent" before his children can be removed from his custody. *Id.* at 649, 92 S.Ct. at 1211–12. The Court also concluded that denying an unwed father a hearing on his fitness while granting it to other parents violates the Equal Protection Clause. *Id.* at 658, 92 S.Ct. at 1216. *Stanley* did not dis-

National Counsel of Adoption submitted an amicus brief in support of the Roths. After we granted certiorari, the Children, Youth and Families Department, the ACLU, the Legal Action Project of the National Committee for the Rights of the Child, and the National Child Rights Alliance all submitted amicus briefs to this Court.

cuss whether fitness must be addressed by courts as a distinct issue.

Six years later, in *Quilloin v. Walcott,* the Supreme Court unanimously upheld a Georgia statute that allowed the adoption of an illegitimate child without the consent of the natural father. 434 U.S. at 256, 98 S.Ct. at 555. The trial court had granted the adoption on the ground that it was "in the best interests of the child." *Id.* at 251, 98 S.Ct. at 553. The child, then about 12 years old, had been in the custody of his mother since birth. *Id.* at 247, 98 S.Ct. at 550–51. The mother had married another man. After the child had lived with this couple for about nine years the mother consented to allow her husband to adopt the child. *Id.* The Court concluded that under the circumstances of that case, where the unwed father had never sought or had physical or legal custody of his child, the father's substantive rights were not violated by the application of a "best interests of the child" standard. *Id.* at 255, 98 S.Ct. at 555. The Court stated that it had "little doubt" that the Due Process Clause would be offended if a state were to attempt to force the breakup of a "natural family ... without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest." *Id.* at 255, 98 S.Ct. at 555 (quoting *Smith,* 431 U.S. at 862–63, 97 S.Ct. at 2119 (Stewart, J., concurring)). The Court held, however, that, given the father's conduct, the state was not required to find anything more than that the adoption was in the best interests of the child. *Id.* *Quilloin* offered no specific directives about how unfitness should be established.

In *Caban v. Mohammed,* 441 U.S. 380, 394, 99 S.Ct. 1760, 1769, 60 L.Ed.2d 297 (1979), the Supreme Court invalidated, on equal protection grounds, a New York statute that provided that an illegitimate child could be adopted by virtue of the consent of the mother alone. The father, Caban, had lived with and supported the mother and his two children from birth until the time the couple separated. *Id.* at 382, 99 S.Ct. at 1763. The Court found the New York statute to be an overbroad generalization in gender-based classifications. *Id.* at 394, 99 S.Ct. at 1769. The Court indicated, however, that nothing in the Equal Protection Clause would preclude the state from granting an adoption without a father's consent if he did not "come forward to participate in the rearing of his child." *Id.* at 392, 99 S.Ct. at 1768. The Court noted that under New York law, the adoption could proceed "in absence of consent when the parent whose consent otherwise would be required ... has abandoned the child." *Id.* *Caban* did not clarify the significance of parental unfitness. As the case was resolved on equal protection grounds, the Court declined to address appellant's other arguments, and the Court stated that it expressed no view as to whether the Due Process Clause precluded a state from granting an adoption in the absence of a determination that the parent whose rights were to be terminated was "unfit." *Id.* at 394 n. 16, 99 S.Ct. at 1769.[7]

The Supreme Court's most recent decision addressing the extent to which a natural father's relationship with his child receives protection under the Due Process Clause is *Lehr v. Robertson,* 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983). The unwed father in that case protested because he was not given notice of the adoption proceedings instituted by the child's mother and her husband, whom she married about a year after the birth of the child. *Id.* at 250, 103 S.Ct. at 2987–88. The natural father had never lived with the mother and the child after the child's birth, he had never provided financial support, he was not identified as the father on the child's birth certificate, nor did he enter his name in New York's "putative father registry." *Id.* at 251–52, 103 S.Ct. at 2988–89. The Court held that due process

---

**7.** It has not been suggested in this case that Bookert's interest in retaining his parent-child relationship with his son is any less because he and Medina were unmarried. Until the time Medina separated from him taking the children, Bookert exercised full custodial responsibility over the children. Like the father in *Caban,* who had at one time participated in the care and support of the children, and who had at one time exercised custodial responsibility for them, Bookert is certainly entitled to the same procedural and substantive protection that unwed mothers, or any other parents, are provided under our state law.

was not violated by the failure to provide notice of the proceedings to the father because his mere biological relationship with the child did not warrant the same degree of constitutional protection as a developed parent-child relationship in which an unwed father demonstrates a full commitment to the responsibilities of parenthood. *Id.* at 261–66, 103 S.Ct. at 2993–96. *Lehr* never mentioned parental unfitness as a necessary requisite under the Due Process Clause for termination of the father's parental rights.

In *Santosky v. Kramer* the Supreme Court held that before a state may sever the rights of parents in their natural children, due process requires that the state "support its allegations by at least clear and convincing evidence." 455 U.S. at 747–48, 102 S.Ct. at 1392. In a footnote the Court stated: "Nor is it clear that the State constitutionally could terminate a parent's rights *without* showing parental unfitness." *Id.* at 760 n. 10, 102 S.Ct. at 1398 n. 10 (citing *Quilloin*, 434 U.S. at 255, 98 S.Ct. at 555). While *Santosky* is a procedural due process case, and the statement in the footnote certainly no more than dicta, it is instructive that the Court in *Santosky* carefully refrained from any constitutional holding regarding the substantive criteria necessary under the Due Process Clause to justify termination of parental rights. In *Santosky*, applicable state law allowed termination upon a finding that the child has been "permanently neglected." *Id.*, 455 U.S. at 749, 102 S.Ct. at 1392–93. It is apparent that the Court equated such a finding with a "judicial determination that the parents are unfit to raise their own children." *See id.* at 760–61, 102 S.Ct. at 1398–99.

While *Santosky* did not expressly say as much, we believe that the specific substantive allegations necessary to support a termination of parental rights were intended to remain a matter of state law. In each of the five cases just discussed, the term "unfitness" when used by the Supreme Court with reference to a constitutional prerequisite for the termination of parental rights, or the forced breakup of a natural family, is used in a very broad sense. The term at a minimum applies to cases of abandonment, neglect, or abuse of the child.

In discussing generally recognized grounds for involuntary termination of parental rights, Professor Homer H. Clark, Jr. states that unfitness is "perhaps the least precise of all grounds and the most capable of confusion with other grounds." Homer H. Clark, Jr., *The Law of Domestic Relations in the United States* § 21.7, at 645 (2d ed. 1987). He states that the unfitness standard "generally requires proof of such serious parental inadequacy as child neglect, child abuse, parental inability to care for the child, or conditions such that the child will suffer severe physical or emotional harm if left in the care of the parent." *Id.* § 20.6, at 530 (footnotes omitted). Professor Clark also points out that "[a]bandonment of the child is the equivalent of unfitness." *Id.*

We believe that any showing of parental unfitness required under *Stanley, Quilloin,* or even *Santosky,* is met by proof of substantive criteria demonstrating parental inadequacy or conduct detrimental to the child. It would include numerous grounds, defined by state law, that establish the inability to carry out the responsibilities of parenthood, or the lack of interest in doing so despite that ability. This broad meaning that we ascribe to the term "unfitness" is expressly suggested by our own case law. In *Shorty v. Scott,* 87 N.M. 490, 493, 535 P.2d 1341, 1344 (1975), this Court recognized the general applicability of the "parental right" doctrine in custody disputes between parents and non-parents. The Court required a finding of parental unfitness before a non-parent was awarded custody over a natural parent. *Id.* at 494, 535 P.2d at 1345. In a footnote, the Court explained that it intended to use the term "unfit" in a broad sense that included parental neglect, abandonment, incapacity, moral delinquency, instability of character, or the inability to provide the child with needed care. *See id.* at 494 n. 10, 535 P.2d at 1345 n. 10 (and related text).

New Mexico statutory law allows the termination of parental rights when the child has been abandoned. Section 32–1–54(B)(1). Termination is also permitted when the child has been neglected or abused. NMSA 1978, § 32–1–54(B)(3) (Repl.Pamp.1989), *repealed by* 1993 N.M.Laws, ch. 77, § 234(A) (recom-

piled as amended at NMSA 1978, § 32A–4–28(B)(2) (Repl.Pamp.1993)) (neglect and abuse are broadly defined by NMSA 1978, Section 32–1–3(L) & (M) (Repl.Pamp.1989), *repealed by* 1993 N.M.Laws, ch. 77, § 234(A) (recompiled respectively as amended at NMSA 1978, § 32A–4–2(C) & (B) (Repl. Pamp.1993))). We think that parental unfitness is inherent in a finding by the court that any of these conditions exist, and no separate showing or finding by the court with reference to unfitness is necessary. For reasons that we explain below, the same can be said with regard to the presumptive abandonment statute, Section 32–1–54(B)(4), which represents a separate ground for the termination of parental rights.

## IV. THE PRESUMPTION OF ABANDONMENT AS A BASIS FOR TERMINATING PARENTAL RIGHTS

■ The New Mexico presumptive abandonment statute, Section 32–1–54(B)(4), provides in pertinent part:

The court shall terminate parental rights with respect to a minor child when: ...

....

(4) the child has been placed in the care of others, including care by other relatives, either by a court order or otherwise and the following conditions exist:

(a) the child has lived in the home of others for an extended period of time;

(b) the parent-child relationship has disintegrated;

(c) a psychological parent-child relationship has developed between the substitute family and the child;

(d) if the court deems the child of sufficient capacity to express a preference, the child prefers no longer to live with the natural parent; and

(e) the substitute family desires to adopt the child.

Under NMSA 1978, Section 32–1–54(C) (Repl.Pamp.1989), *repealed by* 1993 N.M.Laws, ch. 77, § 234(A) (recompiled at NMSA 1978, § 32A–4–28(C) (Repl. Pamp.1993)), a finding by the court that all of the conditions set forth in Section 32–1–54(B)(4) exist creates a rebuttable presumption of abandonment.

This presumption imposes on the parent against whom it is directed the burden of going forward with evidence to rebut or meet the presumption. It does not shift the burden of proof; that burden remains on the party seeking termination of parental rights. *See* SCRA 1986, 11–301 (Repl.Pamp.1994); *Mortgage Inv. Co. v. Griego,* 108 N.M. 240, 243–44, 771 P.2d 173, 176–77 (1989) (discussing effect of evidentiary presumptions). We have indicated that presumptions in a civil non-jury trial are little more than rhetorical devices. *Mortgage Inv. Co.,* 108 N.M. at 244, 771 P.2d at 177. One can argue them to a judge, however, they have no mandatory effect upon his or her decision. *Id.* The significance of the evidentiary presumption in this case, involving termination of parental rights, is that the factfinder "may infer the existence of the presumed fact from proof of the basic facts." *Id.* (quoting 21 Charles A. Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5126 (1977)). Specifically, abandonment may be inferred entirely from proof of the circumstances listed in Section 32–1–54(B)(4).

It is the ultimate fact of abandonment, inferred from the conditions set forth in the statute, that justifies the termination of parental rights under Section 32–1–54(B)(4). As we have indicated, abandonment of one's child establishes parental unfitness. Thus, if abandonment is established under Section 32–1–54(B)(4), no separate showing, finding, or even inquiry concerning fitness or unfitness is necessary. This being said, however, we must acknowledge that the legislature is not free to simply list any set of conditions and then state that proof of these conditions gives rise to a presumption of abandonment or some other ultimate fact. There are constitutional constraints to the use of presumptions, especially those that work a deprivation of liberty.

In the context of criminal cases, the United States Supreme Court has held that a statutory presumption is "'irrational' or 'arbitrary,' and hence unconstitutional, unless it can be said with 'substantial assurance' that the presumed fact is more likely than not to

flow from the proved fact on which it is made to depend." *Leary v. United States,* 395 U.S. 6, 36, 89 S.Ct. 1532, 1548, 23 L.Ed.2d 57 (1969). In civil cases, the Supreme Court has required a "rational connection between the fact proved and the ultimate fact presumed." *Mobile, J. & K.C.R.R. v. Turnipseed,* 219 U.S. 35, 43, 31 S.Ct. 136, 138, 55 L.Ed. 78 (1910). While proceedings that involve the termination of parental rights are not criminal in nature, they certainly demand a greater degree of factual certainty than ordinary civil proceedings. This was the basis for the Supreme Court's requirement in *Santosky* that the state prove its allegations in parental termination cases at least by clear and convincing evidence. *See* 455 U.S. at 768–69, 102 S.Ct. at 1402–03. For this reason, we think that in any presumptive evidentiary scheme devised to prove abandonment, there must be more than a mere rational connection between the conditions listed by statute and the presumptive fact established by those conditions. We believe there must exist a strong rational connection between them that affords substantial assurance that the presumed fact of abandonment follows from proof of the conditions listed in the statute.

■ In New Mexico, we have adopted an objective evidentiary definition of abandonment that focuses on the effect of the parent's conduct on the child. *See In re Adoption of Doe (Doe v. Heim),* 89 N.M. 606, 618, 555 P.2d 906, 918 (Ct.App.), *certs. denied,* 90 N.M. 7, 558 P.2d 619 *and* 90 N.M. 8, 558 P.2d 620 (1976) [hereinafter *Doe v. Heim*]. A parent need not have a subjective intent to abandon the child for abandonment to have occurred. *See id.* (rejecting subjective intent standard for abandonment). Abandonment is defined by the outward behavior of the parent as perceived and interpreted by others; there is no inquiry into the parent's concealed and unexpressed intentions.[8] "[A]bandonment consists of conduct on the part of the parent which implies a conscious disregard of the obligations owed by a parent to the child, leading to the destruction of the

parent-child relationship." *Id.* (quoting *D.M. v. State,* 515 P.2d 1234, 1237 (Alaska 1973)), *quoted with approval in In re Adoption of Doe (Lee v. Lee),* 100 N.M. 764, 767, 676 P.2d 1329, 1332 (1984).

■ Thus, we have emphasized that two factors must both be established to prove abandonment: (1) parental conduct evidencing a conscious disregard of obligations owed to the child, and (2) this conduct must lead to the disintegration of the parent-child relationship. We emphasize that both factors must be established to prove abandonment, and that evidence of the disintegration of the parent-child relationship is of no consequence if not caused by the parent's conduct. *See Doe v. Heim,* 89 N.M. at 618, 555 P.2d at 918. The presumptive abandonment statute must establish these two factors before it can be used to constitutionally terminate parental rights; in other words, these two factors must be fully demonstrated by the set of presumptions used to justify the separation of a child from his or her biological parents.

The presumptive abandonment statute expressly calls for proof of the second factor, that "the parent-child relationship has disintegrated." Section 32–1–54(B)(4)(b). Furthermore, the first factor is established by proving the criteria listed in the remainder of the same statute. *See* § 32–1–54(B)(4)(a), (c), (d) & (e). Demonstrating these criteria provides proof of parental conduct that could cause the parent-child relationship to disintegrate. This is illustrated by Section 32–1–54(B)(4) which requires a showing in all cases of presumed abandonment that "the child has been placed in the care of others, including care by other relatives, either by a court order or otherwise." Section 32–1–54(B)(4)(a) goes on to require evidence that "the child has lived in the home of others for an extended period of time." Under specific circumstances, proof of these events can be sufficient to demonstrate parental conduct that has caused disintegration of the parent-child relationship. For example, one parent

---

8. A finding of intent to abandon is certainly unnecessary to prove legal abandonment. We point this out because the opinion of the Court of Appeals in this case implies such a requirement,

or at least suggests that the district court erred in not making such a finding. *See In re Adoption of J.J.B.,* 117 N.M. at 34, 868 P.2d at 1259.

may acquiesce to the other parent placing the child into the care of others, or the parent may personally make such a placement. Or it may be that the state will temporarily remove the child from the parent's home because the parent has neglected or abused the child. Thereafter, the parent may continue to demonstrate disregard for his or her parental duties by failing to maintain personal contact with the child. Eventually the child quite naturally may develop a psychological parent-child relationship with his substitute caregivers. Under such circumstances it is highly probable that the parent has exhibited a conscious disregard for his or her parental obligations. Further, it can be argued that the parent's conduct has caused the disintegration of the parent-child relationship. In such examples, proof of the conditions listed in Section 32–1–54(B)(4) are reasonably demonstrative of abandonment—enough so as to justify application of the presumptive scheme.

■ On the other hand, the requirements of the statute would not be satisfied if one parent placed the child into the care of others without the knowledge or consent of the other parent, and the second parent, despite good-faith efforts, has been unsuccessful in maintaining contact with, or regaining custody of, the child. Under these circumstances, when the parent-child relationship has disintegrated after a parent has been wrongfully deprived of the company or custody of the child, it cannot be said with *any* degree of assurance that the presumed fact of abandonment follows from the simple proof of the circumstances listed in the statute. When the parent bears no responsibility for the disintegration of the relationship, proof of the conditions listed in Section 32–1–54(B)(4) is not logically demonstrative of abandonment. Indeed, application of the presumptive abandonment statute to such circumstances could have the effect of sanctioning the results of illegal conduct.

Proof of abandonment requires that the objective parental conduct be the cause of the destruction of the parental-child relationship. *Doe v. Heim*, 89 N.M. at 618, 555 P.2d at 918. We think a presumption of abandonment arising under Section 32–1–54(B)(4) de-

mands no less. There is no assurance otherwise that the conditions listed in the statute have even a rational connection with the presumed fact of abandonment. For this reason we construe Section 32–1–54(B)(4) and subparagraph (C) to require such a relationship. We hold that a presumption of abandonment that arises through proof of the factors listed in Section 32–1–54(B)(4) is completely rebutted by showing that a parent lacks responsibility for the destruction of the parent-child relationship.

The importance of parental conduct causing the disintegration of the parent-child relationship is supported by earlier New Mexico decisions addressing the application of the presumptive abandonment statute, Section 32–1–54(B)(4), and its precursor NMSA 1978, Section 40–7–4(B)(4) (Repl.Pamp.1983), *repealed by* 1985 N.M.Laws, ch. 194, § 39. In *In re Samantha D.*, 106 N.M. 184, 186, 740 P.2d 1168, 1170 (Ct.App.), *cert. denied*, 106 N.M. 174, 740 P.2d 1158 (1987), the trial court found that although the mother would not have been unfit to raise her child had she not initiated an adoption process, she had nonetheless caused the child to be in the care of the adoptive family within 48 hours of the infant's birth. When the mother sought to revoke her consent to the adoption, arguing that her consent failed to comply with certain statutory requirements and was therefore invalid, her parental rights were terminated under the presumptive abandonment statute. *Id.* at 185, 740 P.2d at 1169. Rejecting the mother's assertion that it was error for the trial court to have found abandonment under Section 32–1–54(B)(4), the Court of Appeals stated that it was clear that the very result of which the mother complained was "initiated by her own actions." *Id.* at 187, 740 P.2d at 1171.

In *In re Adoption of Doe (Jacklin v. Dudley)*, 101 N.M. 34, 35, 677 P.2d 1070, 1071 (Ct.App.), *cert. denied*, 101 N.M. 11, 677 P.2d 624 (1984) [hereinafter *Jacklin v. Dudley* ], the Court of Appeals upheld the trial court's denial of the petition of two grandparents to adopt their two minor grandchildren. The mother in that case had agreed to placing the children under the guardianship of her father after her divorce. After her father was ap-

pointed guardian, the mother was prevented from having any contact with the children despite the fact that the petition for guardianship stated that the father would permit such visitation. The mother sought to terminate the guardianship, and the grandparents sought to terminate the mother's parental rights under Section 40–7–4(B)(4). Although the trial court found that the parent-child relationship between the mother and her children had disintegrated, and a psychological parent-child relationship had developed between the grandparents and the two children, the trial court refused to terminate the mother's parental rights. The trial court found that the grandparents by their own conduct had contributed to the destruction of the parent-child relationship. The Court of Appeals stated that a key element in determining whether parental rights should be terminated under Section 40–7–4(B)(4) was whether the parent-child relationship had disintegrated. *Id.* at 38, 677 P.2d at 1074. However, the Court stated that the grandparents cannot "point to evidence that establishes the disintegration of the parent-child relationship on the one hand, and ignore evidence that [the grandparents'] own actions constituted the causative factors which have precluded the natural parents from any meaningful contact with their minor children or which have prevented them from any opportunity to improve their parent-child relationship." *Id.* The Court held that the party seeking to perfect the adoption must not by their own conduct have intentionally contributed to the factors causing the disintegration of the parent-child relationship. *Id.*

The trial court action in *Jacklin v. Dudley* was initiated under a precursor of Section 32–1–54 that did *not* yet include the subsection stating that a finding of the conditions listed in the statute would "create a rebuttable presumption of abandonment." *See* 101 N.M. at 37 n. 1, 677 P.2d at 1073 n. 1; *see also* NMSA 1978, § 40–7–4(B)(4) (Cum.Supp. 1982), *amended by* 1983 N.M.Laws, ch. 239, § 2 (codified as amended at NMSA 1978, § 40–7–4 (Repl.Pamp.1983)). This language was added in 1983 as a new subsection C. *See* § 40–7–4 (Repl.Pamp.1983). However, the conditions permitting termination that were listed in the 1982 precursor of the presumptive abandonment statute have largely remained unchanged, and in essence are those embodied in the present version of the statute. *Compare* Section 40–7–4(B)(4) (Cum.Supp.1982) *with* Section 40–7–4(B)(4) (Repl.Pamp.1983) *and* Section 32–1–54(B)(4) (Repl.Pamp.1989) *and* Section 32A–4–28(B)(3) (Repl.Pamp.1993)). We believe that the holding of *Jacklin v. Dudley* regarding the cause of the disintegration of the parent-child relationship remains directly applicable to the presumptive scheme subsequently adopted by the legislature and still in force today.

## V. PARENTAL RESPONSIBILITY FOR THE DISINTEGRATION OF THE PARENT–CHILD RELATIONSHIP

■ A review of the evidence before the trial court in this case leads but to one reasonable conclusion: Bookert bore little, if any, responsibility for disintegration of his relationship with his son. Although Bookert maintained contact with Medina and the children after the couple separated, he had no forewarning that Medina intended to place the child for adoption. The placement occurred about seven weeks after their initial separation, and about four weeks after he had last seen Medina and the children in Albuquerque. Once Bookert learned of the placement, the evidence before the trial court uniformly showed that Bookert made immediate and repeated attempts to compel the agency to give him custody of his son so that he could raise the child himself.

Moreover, when his son was not returned to him, we think Bookert made all reasonable efforts under the circumstances to regain custody of his son, and also to maintain his relationship with his son while the child was in the custody of the Roths. While we are at a loss to explain why his first attorney took no significant action on Bookert's behalf, Bookert did quickly engage legal counsel to oppose the adoption, paid him, and entrusted the case to him. Whether any action on the part of Bookert's first attorney would have been any more successful than the efforts made by Bookert's subsequent attorneys seems doubtful. La Familia and the Roths ignored the demand letter of Bookert's sec-

ond attorney to return the child to his parents. While the Roths have faulted Bookert for not requesting visitation with his son until May 15, 1991, the Roths opposed the subsequent motion for visitation filed on July 1, 1991. Under these circumstances, we think Bookert does not bear responsibility for the disintegration of his relationship with his son, and we hold that any presumption of abandonment that arose under Section 32–1–54(B)(4) was rebutted as a matter of law.

We find it difficult to understand how an adoption agency, acting responsibly, could have placed J.J.B. for adoption on the very same day it was first contacted by Medina, and after immediate protest from the child's father from whom the mother had only recently separated. Bookert could not be dismissed as a father who had never assumed any responsibility for his family and whose connection with the child was purely genetic. Human Services Department regulations may allow, pending a determination of status of the parent's rights, placement of a child who is not legally free for adoption. Nevertheless, we think any responsible agency would assess and investigate, prior to the placement of the child, the degree of likelihood that the termination of the parent's rights would be successful. The general inadequacy of grounds for dispensing with Bookert's consent to the adoption was readily apparent. Thus the original petition was amended three times, each amendment asserting new grounds for dispensing with Bookert's consent. It was only after almost a year that the presumptive abandonment statute was brought into play.

We acknowledge that Medina appears to have been in a state of crisis when she contacted the agency, and that the child appeared not to have been properly cared for. However, if there was some question that Bookert was incapable of caring for the child, or that the child had been neglected or abused under our law, the matter should have been immediately referred to the Human Services Department to obtain an ex parte order of temporary custody. By placing the child with the Roths while knowing that the child's father, only recently separated from the mother, had no intention of

relinquishing his parental rights, the agency immediately pitted the protective instincts of the Roths against the equally strong natural desire of a father not to lose his child. It was certainly foreseeable that the child could suffer greatly, whichever party were to prevail.

## VI. THE BEST INTERESTS OF THE CHILD

Though we affirm the judgment of the Court of Appeals that the proposed adoption should be voided, we still must consider the fate of J.J.B. The point of greatest emotional tension in this case is the prospect of tearing a young child away from those with whom he has probably developed a strong familial bond and placing him in the custody of another—even though this other is the child's natural parent. The resolution of this case lies in deciding the best interests of the child when a biological parent-child relationship is at issue.

Some courts have adopted a bright line solution to the placement of the child when an adoption is voided because of lack of consent by a natural parent. The Illinois Supreme Court recently employed this bright line approach in *In re Doe,* 159 Ill.2d 347, 202 Ill.Dec. 535, 536, 638 N.E.2d 181, 182, *certs. denied,* —— U.S. ——, 115 S.Ct. 499, 130 L.Ed.2d 408 (1994). The Illinois court seemed to conclude that the child's best interests are defined entirely by the rights of the natural parents when parental rights have been improperly terminated. Thus the court automatically awarded custody of the child to the biological parent. We decline to adopt this bright line approach. We are directed to do otherwise, not only by the letter of the law but also by compassion for the people involved.

■ A finding that parental rights were improperly terminated does not mechanically result in the award of custody to the biological parents. The termination of parental rights and the determination of custody are different issues and must be addressed separately. *See In re Samantha D.,* 106 N.M. at 188, 740 P.2d at 1172 ("In keeping with the best interests of the child, the trial court retains the power to determine custody in

the absence of a legally valid consent, and it was within the authority of the trial court to continue Samantha in the custody of [the foster parents]."); *In re Perkins*, 352 N.E.2d 502, 509 (Ind.Ct.App.1976) (stating that awarding custody to the nonparent may alter the personal relationships between child and parent, but terminating parental rights will divest all legal rights, privileges, duties, and obligations between parent and child); *State ex rel. Lewis v. Lutheran Social Servs.*, 59 Wis.2d 1, 207 N.W.2d 826, 829 (1973) ("[W]here an adoption proceeding is void, the 'adoptive parents' could be allowed to retain custody where it would be in the best interests of the child."), *aff'd as modified*, 68 Wis.2d 36, 227 N.W.2d 643 (1975); *but see id.* ("While it is possible to grant custody in divorce cases without terminating parental rights and perhaps in other cases, it is not possible to give custody based upon adoption without a termination of parental rights.").

▌ In New Mexico we give great weight to the presumption that, when a family breaks up, custody should go to the natural parent. *Shorty*, 87 N.M. at 492–93, 535 P.2d at 1343–44. The public policy of New Mexico in custody matters is demonstrated by NMSA 1978, Section 40–4–9.1(K) (Repl. Pamp.1994), providing that "[w]hen any person other than a natural ... parent seeks custody of a child, no such person shall be awarded custody absent a showing of unfitness of the natural ... parent." Indeed, under ordinary circumstances, the rights of the natural parent and the best interests of the child are compatible; the presumption is that it is in the child's best interests to be raised by his or her biological parents. *Bennett v. Jeffreys*, 40 N.Y.2d 543, 387 N.Y.S.2d 821, 826, 356 N.E.2d 277, 282 (1976), *aff'd* 59 A.D.2d 492, 399 N.Y.S.2d 697 (1977); *Judd v. Van Horn*, 195 Va. 988, 81 S.E.2d 432, 436 (1954) (in a custody dispute between a parent and a non-parent "the law presumes that the child's best interests will be served when in the custody of its parent"). However, this presumption is never conclusive. *Bailes v. Sours*, 231 Va. 96, 340 S.E.2d 824, 827 n. * (1986). Custody based upon the biological parent-child relationship may be at odds with the best interests of the child. When that happens, the best interests of the child must

prevail. *See In re Adoption of Francisco A.*, 116 N.M. 708, 714, 866 P.2d 1175, 1181 (Ct. App.1993) ("It is well established in New Mexico that parents do not have absolute rights in their children; rather parental rights are secondary to the best interests and welfare of the children."); *In re Adoption of Bradfield*, 97 N.M. 611, 614, 642 P.2d 214, 217 (Ct.App.1982) ("The paramount issue in an adoption proceeding ... is the welfare of the child.").

▌ A parent's right is not absolute and under extraordinary circumstances, custody of a child may be awarded to a nonparent over the objections of a parent. The presumption favoring the natural parent can be rebutted by showing serious parental inadequacy with clear and convincing evidence. An example of this position is found in the Virginia case *Bailes v. Sours*. The Virginia court discussed factors relating to parental fitness that, in a custody dispute between a parent and a non-parent, will rebut the presumption favoring the biological parent. *Bailes*, 340 S.E.2d at 827; *see also Shorty*, 87 N.M. at 494 n. 10, 535 P.2d at 1345 n. 10 (and related text) (listing factors that demonstrate parental unfitness). However, the court noted that, in addition to the traditional parental unfitness criteria, "special facts and circumstances" might be found that would provide "an extraordinary reason" for taking a child from its parent. *Bailes*, 340 S.E.2d at 827 (quoting *Wilkerson v. Wilkerson*, 214 Va. 395, 200 S.E.2d 581, 583 (1973)). The rationale behind these "special facts and circumstances" seems to be the anticipation of unique situations that are beyond the usual unfit-parent criteria and are not expressly covered by statute or case law.

For example, an extraordinary reason might be the fact that, over the course of the litigation, the natural parent's circumstances have so significantly changed as to render the parent unfit. The degeneration from parental competence to parental unfitness must be demonstrated by clear and convincing evidence. *See* NMSA 1978, § 32A–4–29(J) (Repl.Pamp.1993) ("The grounds for any attempted termination shall be proved by clear and convincing evidence."). The

monetary situation of the natural parent is relevant only to the extent that it renders the parent unfit. *In re Adoption of L.,* 61 N.Y.2d 420, 474 N.Y.S.2d 447, 452, 462 N.E.2d 1165, 1170 (1984) ("The comparative material advantages offered by the nonparents are emphatically not an extraordinary circumstance disqualifying the natural parent, nor can they outweigh parental rights under the guise of determining the best interests of the child.").

Another extraordinary circumstance, as suggested by the New York Court of Appeals in *Bennett v. Jeffreys,* might arise if the child's contact with the biological parents has been so minimal that he or she has significantly bonded with the adoptive parents. 387 N.Y.S.2d at 827, 356 N.E.2d at 284 ("[T]he child may be so long in the custody of the nonparent that, even though there has been no *abandonment* or *persisting neglect* by the parent, the psychological trauma of removal is grave enough to threaten destruction of the child."). We caution, however, as did the *Bennett* court, that the test for this involuntary disruption of the bond between parent and child "is met only with great difficulty, for evident reasons of humanity and policy." *Id.* at 826, 356 N.E.2d at 283.

Once extraordinary circumstances are shown by clear and convincing evidence, the court should then make a determination based on the best interests of the child. *Id.* at 826, 356 N.E.2d at 283. Our reasoning here is supported by the language of the New Mexico statute that directs what the court should do when an adoption proceeding has been voided:

> If the court determines that any of the requirements for a decree of adoption under Subsections E and F of this section has not been met [including obtaining all necessary consents, relinquishments, terminations or waivers] or that the adoption is not in the best interests of the adoptee, the court shall deny the petition and determine, in the best interests of the adoptee, the person who shall have custody of the child.

NMSA 1978, § 40–7–51(C) (Repl.Pamp.1989), *repealed by* 1993 N.M.Laws, ch. 77, § 234(E) (recompiled at NMSA 1978, § 32A–5–36(H)

(Repl.Pamp.1993)). This statute avoids any suggestion that a natural parent who seeks custody upon denial of a petition for adoption will automatically be awarded custody. An inquiry into extraordinary circumstances is implicitly encouraged. Similarly, subsection (D) of the same statute prescribes that, in the event that the court invalidates the parents' consent or relinquishment for adoption, "the court shall determine, in the best interests of the adoptee, the person who shall have custody of the child." NMSA 1978, § 40–7–49(D) (Repl.Pamp.1989), *repealed by* 1993 N.M.Laws, ch. 77, § 234(A) (recompiled at NMSA 1978, § 32A–5–36(D) (Repl.Pamp. 1993)). There is nothing in this statutory language requiring that "the person who shall have custody" is necessarily the biological parent. This statute distinguishes rights from remedies. It does not assume that returning the child to the custody of the natural parent is the only way or the best way to vindicate the rights of the parent who has been wronged. The legislature intended that the subject of the controversy, the child, be given paramount consideration. *Cf.* Unif. Adoption Act § 3–704, 20 Fam.L.Rep. (BNA) No. 44, at 2048 (Sept. 20, 1994) (if adoption is denied the Court "shall determine the minor's custody according to the best interest of the minor").

Unfortunately, the expression "best interests of the child" may have a different meaning for each person. *State ex rel. Lewis,* 207 N.W.2d at 831. There are few guidelines that delineate the meaning of this phrase or the criteria by which a court can apply it as a legal standard. *Id.* Judges who must address this matter are often compared to Solomon, and to some extent the court's determination of the child's best interests must be characterized as intuitive. The problem would be simple if judges were endowed with the prescience to foresee the consequences of their decisions. *Id.*

The phrase "best interests of the child" does not connote that either the natural or the adoptive parents may be able to provide the child with superior creature comforts. *Bennett,* 387 N.Y.S.2d at 826, 356 N.E.2d at 283; *Gutierrez v. New Mexico Dep't of Pub. Welfare,* 74 N.M. 273, 275, 393 P.2d 12, 14

(1964) ("In an adoption proceeding, the welfare and best interest of a child are not measured altogether by material and economic factors, parental love and affection must find some place in the scheme."). Nor should the court attempt to compare "the depth of love and affection between the child and those who vie for its custody." *Bennett,* 387 N.Y.S.2d at 826, 356 N.E.2d at 283.

The child's best interests involve an evaluation of the child's physical, intellectual, and moral well being. *Pennsylvania ex rel. Husack v. Husack,* 273 Pa.Super. 192, 417 A.2d 233, 235 (1979). The Kentucky Court of Appeals has stated:

> We believe ... that in child custody cases the term 'best interests' has acquired a special meaning; and when used in cases involving the taking of custody from a natural parent and giving it to someone else it means the opposite of being detrimental or harmful to the child's interests rather than indicating the top among several perfectly acceptable choices.

*Mandelstam v. Mandelstam,* 458 S.W.2d 786, 788 (Ky.1970). The case before us offers no truly acceptable choice. Instead, we must be resigned to a solution that causes the least amount of harm.

With these principles in mind, we remand this matter to the trial court for a determination of custody as prescribed by Section 40–7–51(C). The trial court is best suited for finding the delicate balance of interests in the natural parent-child relationship as measured against custody in other persons; such a decision cannot be based upon the written appellate record. *See In re Three Minor Children,* 406 A.2d 14, 17 (Del.1979) ("[I]t should be obvious that no case is less susceptible to satisfactory decision on the basis of a written record than one involving children.") (quoting Homer H. Clark, Jr., *The Law of Domestic Relations in the United States* § 18.5, at 631 (1968)).

In making its determination, the trial court is to consider two issues: First, whether Bookert's fitness as a parent has significantly altered since the trial court's original ruling. Specifically, the court should evaluate whether there is clear and convincing evidence of gross misconduct such as incapacity, moral delinquency, instability of character, or inability to provide J.J.B. with needed care. *See Shorty,* 87 N.M. at 494, 535 P.2d at 1345 (quoting *Wallin v. Wallin,* 187 N.W.2d 627, 630 (Minn.1971).

Second, the court should determine whether, taking into account all factors, Bookert is capable of reestablishing a healthy parent-child bond with J.J.B. If, despite the development of a psychological parent-child relationship between the adoptive parents and the child, a psychological parent-child relationship can be restored between the natural parent and the child, then granting custody to the natural parent is in the best interests of the child. *Cf. In re Peter M.,* 602 A.2d 1161, 1163 (Me.1992) (stating that "the child's ability to integrate back into the parent's home" is a factor to be considered in determining best interests of child). It is conceivable that the biological parent, though not unfit and not responsible for the disintegration of the parent-child relationship, may still be incapable of reestablishing the necessary parental bond with the child. The preference of the child can also be an important—though not controlling—factor in this matter. The child's age, maturity, and intelligence should be considered in determining his preference. *Husack,* 417 A.2d at 235. The significance of Bookert's regular visits, if any, with J.J.B., as required by the Court of Appeals post-opinion order, should also be evaluated. Any proof that Bookert is incapable of meeting the psychological needs of his son must be established by clear and convincing evidence.

Finally, we emphasize that, in resolving the best interests of J.J.B., the trial court should not be bound by the traditional bright line solution of awarding the child like a trophy to whichever party wins the litigation. The child's best interests may be served by applying more equitable principles.

The district court should consider any temporary as well as permanent custody arrangements. It should also consider granting visitation rights to any of the parties. It is possible that the court, in collaboration with the parties, may devise an arrangement that does not permanently sever the child

from either his natural or putative adoptive parents. *See In re Adoption of Francisco A.*, 116 N.M. at 714, 866 P.2d at 1181 ("Although granting visitation to a nonparent does affect a parent's custody rights, this is not sufficient reason to apply a blanket rule against such decrees."). The custody of J.J.B. may depend upon whether the competing parties are disposed to an amicable visitation arrangement. A program of counseling may be warranted for any or all of the parties to help ease the changes the court's decisions may bring. The court must consider the risk that visitation might place the child in the midst of an ongoing bitter dispute. *Id.*

It is often stated that there is no analogy between a custody award and a decision concerning the title to property. *Bennett*, 356 N.E.2d at 281 (discussing "the modern principle that a child is a person, and not a subperson over whom the parent has an absolute possessory interest"). The best interests of J.J.B. would have been easily determined in 1991 when, against his father's wishes, he was first offered for adoption. Now, although ensuring J.J.B.'s well being raises issues that are painfully complex, it is still his best interests that will determine the resolution of this case.

## VII. CONCLUSION

For the foregoing reasons we affirm the judgment of the Court of Appeals that the proposed adoption should be voided. We do, however, overrule and disapprove of its treatment of the presumptive abandonment statute. We remand the issue of custody to the trial court. The Children, Youth and Families Department shall have immediate temporary legal custody of the child. Physical custody shall remain with the Roths, if they so choose, pending resolution of the custody issue by the trial court. The court may consider whether to extend Mr. Bookert's visitation privileges with J.J.B. until this matter reaches a final court-ordered resolution. The trial court is to determine whether Bookert's fitness as a parent has significantly altered or whether he is capable of reestablishing a psychological parent-child bond with J.J.B. Finally, the district court should consider any custody arrangement, temporary or permanent, or visitation by any persons, that is consistent with the rights of the parent, the best interests of the child, and the concepts developed in this opinion. The trial court is to rule upon this remand on an expedited basis.

**IT IS SO ORDERED.**

BACA, C.J., and RANSOM, J., concur.

FRANCHINI, J., dissents.

FRANCHINI, Justice (dissenting).

I agree with the majority's conclusion that the trial court need not make a separate finding of unfitness before terminating parental rights, and I agree with the conclusion that the presumption of abandonment may be rebutted by a showing that the destruction of the parent-child relationship was not caused by parental conduct. I also emphatically agree with the majority's chastisement of the adoption agency in placing J.J.B. for adoption on the same day the mother relinquished the child to the agency, despite Bookert's request that the child be turned over to him. I nonetheless dissent, because in my opinion this case is wrongly decided. The evidence clearly supports the conclusion that Bookert bore the responsibility for the disintegration of his relationship with his son and thus failed to rebut the presumption of abandonment. The court, as factfinder, has already decided that Bookert's parental rights should be terminated, taking into consideration "the physical, mental and emotional welfare and needs of the child," NMSA 1978, § 32-1-54(A) (Repl.Pamp.1989). *See In re Samantha D.*, 106 N.M. 184, 186–87, 740 P.2d 1168, 1170–71 (Ct.App.) (holding that court must consider best interests of child in action to terminate parental rights), *cert. denied*, (August 14, 1987). We should defer to this decision.

In 1976 the Court of Appeals interpreted the term "abandonment" as it appeared in the Adoption Act. *See In re Adoption of Doe (Doe v. Heim)*, 89 N.M. 606, 555 P.2d 906 (Ct.App.), *cert. denied*, 90 N.M. 7, 558 P.2d 619 (1976). The Court held that two factors—parental conduct evidencing a conscious disregard of obligations owed to the

child and destruction of the parent-child relationship—must both be established to prove abandonment. In addition, the evidence of the destruction of the parent-child relationship is of no consequence if it cannot be established that the destruction was caused by parental conduct. *Id.* at 618, 555 P.2d at 930. In 1983 the legislature established a set of conditions which, if demonstrated by clear and convincing evidence, created a rebuttable presumption of abandonment. Those conditions are that (1) the child has been placed in the care of others; (2) the child has lived in the home of others for an extended period of time; (3) the parent-child relationship has disintegrated; (4) a psychological parent-child relationship has developed between the substitute family and the child; (5) the child prefers no longer to live with the natural parent; and (6) the substitute family desires to adopt the child. NMSA 1978, § 32-1-54(B)(4) (Repl.Pamp.1989). In the presumptive abandonment statute, the legislature listed a set of conditions that, if present, are objective evidence that the parent has shown a conscious disregard of the obligations owed to the child. The presumption can be rebutted, however, by a showing that the deterioration of the relationship was beyond the control of the parent, or in other words, was not caused by parental conduct. *See In re Catholic Child Care Soc'y,* 112 A.D.2d 1039, 492 N.Y.S.2d 831, 833 (1985) (stating that statutory presumption of abandonment may be overcome by "evidence sufficient to establish that the absence of contact was the result of circumstances which made [the parent] unable to visit and communicate with the child or agency").

Abandonment is a question of fact, and the trial court's finding of abandonment should be reviewed to determine if the evidence was sufficient to clearly and convincingly establish that fact. *Doe v. Heim,* 89 N.M. at 620-21, 555 P.2d at 920-21. In my opinion we should be engaging in a substantial evidence review to determine if the trial court erred in finding by clear and convincing evidence that Bookert failed to rebut the presumption of abandonment. Instead, the majority reweighs the evidence, disregards clear evidence that Bookert failed to attend to his

parental obligations, and assumes facts that are not in evidence.

The crucial issue is thus whether substantial evidence supports the trial court's conclusion that Bookert's conduct in not visiting or seeking visitation with J.J.B. caused the disintegration of the parent child-relationship. I note initially that Bookert did not, as asserted by the majority, first request visitation with his son on May 15, 1991. The motion hearing on May 15 concerned a motion for custody by Bookert and J.J.B.'s mother. In making the motion, the mother's attorney said that they were asking for "custody, or at least visitation." This was the only mention of the word (or concept) "visitation" during the hearing. The Roths' counsel never once mentioned visitation, and Judge Brennan did not mention visitation in his ruling on custody (in favor of the Roths). Neither Bookert (who was pro se) nor the mother's attorney requested visitation at the time of the adverse custody ruling. The fact is that Bookert never sought visitation with J.J.B. until his attorney made a motion for visitation on July 1, 1991.

The following evidence is clear: J.J.B. lived with Bookert until November 14, 1990, when J.J.B.'s mother left Bookert in Tucson and moved to Albuquerque. Bookert had a brief visit with the child on December 6, 1990. He then had absolutely no contact with the child until November 24, 1991. Bookert's first attempt at getting visitation with J.J.B. was made on July 1, 1991. He thus made no attempt to contact the child for a period of some seven and one-half months, and did not contact the child for a period of almost one year. The fact that Bookert made no attempt to contact or communicate with J.J.B. for an extended period of time is substantial evidence that his conduct caused the disintegration of the parent-child relationship.

The majority appears to place the responsibility for the disintegration of the parent-child relationship on the Roths. It states in Section V that "Bookert *made all reasonable efforts* under the circumstances to regain custody of his son, and also *to maintain his relationship with his son* while the child was in the custody of the Roths." (Emphasis

added). Those efforts consist of a demand letter dated March 14, 1991, from Bookert and the mother's attorney requesting that the Roths return the child to the custody of his parents, and a motion for visitation filed July 1, 1991. The opinion concludes that, because the Roths ignored the request for custody and fought the motion for visitation, that any earlier requests would also have been futile.

In my opinion the majority assumes facts that are not in evidence when it asserts that any attempt by Bookert to get visitation would have been unsuccessful, and that therefore it was the Roths' fault that the relationship of Bookert and J.J.B. was destroyed. Had the Roths successfully resisted Bookert's early and frequent attempts at visitation, it could be said that they were responsible for the breakdown of the relationship. This was not the case, however. Once a proper motion for visitation was made, on July 1, 1991, it was granted by the trial court.

Moreover, the fact that Bookert attempted to get custody of J.J.B. and the Roths resisted those attempts is irrelevant as to whether Bookert abandoned J.J.B. under Section 32–1–54(B)(4) (Repl.Pamp.1989). His efforts at gaining custody show a subjective intent not to abandon the child; however, the determinative factor for abandonment is not the existence of "wishful thoughts and hopes for the child," but rather "how well the parents have discharged their parental responsibilities." *Doe v. Heim*, 89 N.M. at 618, 555 P.2d at 918 (rejecting subjective intent standard as evidentiary basis for determining if abandonment has occurred). A parent's failure to contact or communicate with his or her child for an extended period of time is objective evidence that the parent is not properly discharging parental responsibilities.

I believe that the evidence supports the trial court's conclusion that Bookert was responsible for the disintegration of his relationship with J.J.B. Bookert failed to contact J.J.B. for a year and did not even attempt to contact or communicate with him for over seven months. No one stopped Bookert from seeing, or attempting to see his child; thus his conduct was found to be the cause of the disintegration of the parent-child relationship. The fact that Bookert indicated a continuing interest in obtaining custody seems to be the determining factor for the majority in rejecting abandonment. Bookert's desire to obtain custody, however, is only evidence of his subjective intent. In my opinion, what the majority has done is to adopt the subjective intent standard for abandonment by relying on Bookert's interest in obtaining custody to show that his conduct was not the cause of the disintegration of the relationship. This standard has been rejected by our Court of Appeals and many other courts—and rejected explicitly in Section IV of the majority opinion itself. On the other hand, Bookert's objective manifestations of intent include his failure to seek or obtain visitation with his child for so long as to allow their relationship to disintegrate. By applying the objective standards established by the legislature, there is, in my opinion, substantial evidence to clearly and convincingly show that Bookert abandoned J.J.B. and that his parental rights were subject to termination. *See* Section 32–1–54 (Repl.Pamp.1989).

On remand, the trial court will be required to determine, in the best interests of J.J.B., who shall have his custody. NMSA 1978, § 32A–5–36(D) (Repl.Pamp.1993). It appears to me that this question has already been decided by the trial court. J.J.B.'s guardian ad litem argues that it is clearly in J.J.B.'s best interests to remain with the Roths, and the trial court has already weighed J.J.B.'s interests in deciding to terminate Bookert's parental rights. It serves no purpose to overturn the factual findings of the trial court in this case. We should defer to the judgment of the trial court and allow the Roths' petition of adoption to be granted. We should simply reverse the Court of Appeals on the question whether the trial court need make a separate finding of unfitness before terminating parental rights. The majority opinion being otherwise, I respectfully dissent.